DOROTHY L. COOK ET AL., APPELLEES, v. W. IRVING WILKIE, APPELLANT.

150 N. W. 2d 124

Filed April 14, 1967. No. 36347.

Kartman & Fike, for appellant.

Kennedy, Holland, DeLacy & Svoboda and Thomas R. Burke, for appellees.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

WHITE, C. J.

Stripped of nonessentials, this is an accounting suit to determine the date of payment and the amounts due plaintiff, Dorothy L. Cook, from her father, W. Irving Wilkie, as the result of an agreement between the parties in 1953. Defendant is in the real estate business and was interested in the purchase and sale of a tract of land near Seventy-second and Dodge Streets in Omaha, Nebraska. Plaintiff's version of the original agreement in 1953 was that the defendant was to make a gift to her of $10,000; purchase a one-fourth interest with this money in plaintiff's name in the partnership of Pirruc-cello and Company, which was buying the property at Seventy-second and Dodge Streets; she was to deliver the profits from the sales of the property to the defend-ant; and from the proceeds, less expenses and income tax, defendant would set up a trust fund payable to plaintiff when her daughter Susan reached the age of 18 in April 1965. Defendant's version, which we will analyze later, was to the effect that he was to keep the profits and use them as he saw fit; that after the pay-ment of expenses and income taxes, the profits from the sales were to be loaned to him; and that they were re-

payable to the plaintiff as a claim against his estate after his death, except for a modification of the agreement made after 1953 by which he was to pay for the college expenses of plaintiff's two children.

The evidence is undisputed that the gift of $10,000 was made and a gift tax return filed; that with this money the one-fourth interest in plaintiff's name in the partnership was purchased; that the property at Seventy-second and Dodge Streets was purchased; that the property was sold in various sales over about a 10-year period; that plaintiff signed all of the necessary and numerous papers and documents for completing these transactions; and that she delivered the proceeds to the defendant. Each year the defendant would have the income tax return prepared for the plaintiff and her husband and would pay the necessary taxes to plaintiff.

The trial court found in favor of the plaintiff and entered judgment in the sum of $99,285.91 against the defendant. We affirm the judgment.

Although the theories discussed in the briefs are numerous and the record is voluminous, the issues in this case under the pleadings, admissions of fact, and the stipulation entered herein, are narrow. In his answer, defendant admits the gift of $10,000, admits the ownership of the plaintiff in the partnership and property involved, admits receiving and owing money to plaintiff, and specifically alleges, "* * * that after deducting such sums received by plaintiff directly or for her benefit there remains a balance due plaintiff, subject to the terms of the agreement between plaintiff and defendant as hereinafter set forth, of $86,501.39."

By his answer, defendant further alleges he was to have the use of these funds during his life and that they were payable to plaintiff on his death, with the exception of the payment of college expenses of plaintiff's two children. Defendant affirmatively asks that, "a determination be made of the sums due plaintiff, Dorothy L. Cook; that said sums be decreed payable to

Dorothy L. Cook upon the death of defendant, * * *."

In the defendant's answer to requests for admissions he specifically admits, "that the amount due Dorothy L. Cook from W. Irving Wilkie is $100,549.44," except that said amount is subject to correction by virtue of small amounts retained by Dorothy L. Cook, the exact amount of which were not known by the defendant at the time.

The issue as to the amounts due the plaintiff was further narrowed by a stipulation filed in the case and introduced in evidence by agreement at the trial. This stipulation, prepared by certified public accountants, showed a total of $114,361.67 distributed to defendant by plaintiff, subject to credits for income taxes and expenses in the sum of $25,325.76 paid by the defendant, leaving a net sum due plaintiff of $89,035.91. This stipulation specifically recited that it left unresolved three items of $250, $10,000, and $2,534.52, which will be discussed later in this opinion.

Much of the discussion in the briefs is devoted to the nature of the relationship between the plaintiff and defendant as to whether there was a trust or a debtor-creditor relationship. As we see it, in light of the pleadings, undisputed facts, and admissions of the defendant, it is unnecessary to resolve this question. As defendant states in his brief, the recovery of the money itself is not the true issue, "but rather the time for payment of the money due is the real substance of this action, and basically, that is all that was tried."

The trial court, having heard and seen the witnesses, resolved this question in favor of the plaintiff, and we agree. Plaintiff's testimony, starting with the inception of the transactions involved, was clear, direct, and unequivocal to the effect that these sums were payable to her when her daughter Susan reached the age of 18 in April 1965. For a period of about 10 years, until April 1963, plaintiff unreservedly signed all papers and documents and endorsed all checks necessary to implement

the agreement. Her testimony, undenied by the defendant, is that defendant repudiated the entire agreement after getting her to sign the income tax return on April 15, 1963, which repudiation precipitated this litigation. The defendant's testimony on the other hand, is evasive, uncertain, and contradictory. He admits the gift of $10,000, the purchase for the plaintiff of the partnership interest in the property, and that he had no interest in the property and that it belonged entirely to her. But he testified that originally in 1953 the profits or proceeds, after the payment of income taxes and expenses, were to be given to him. His exact testimony is, "that the balance of the money I was to get and I was to keep." He further testified: "Q. Was she to ever receive that money in any way? A. There was positive understanding to that and there was no understanding that she was to receive any of it in the original agreement." Later, on direct examination, he testified: "She wasn't to give me the money out of the proceeds of the sales of these properties, she was to loan me the money, that was the original agreement, and if she would have given it to me, we would have been in a difficult situation again as to the filing of the gift returns, and it wasn't to be my money, it was a loan." It is significant that in this testimony there is no mention of the money being payable on defendant's death. Then, in the last part of the defendant's direct examination, in response to specific questions, he did testify that she was to receive the profits on his death and that was part of the original agreement. Earlier in his direct testimony defendant testified: "Q. Was anything said (in the original agreement) as to when it would be - when she would receive any of these profits? A. No, never a word was said about it. The first eight years, I think, about, of the Pirruccello and Company - in fact, almost the entire Pirrucello and Company length of tenure, not a word was ever said." On cross-examination, defendant testified that he did have a conversation with plaintiff as to

when the money was going to be repaid to her. Brevity forbids a further analysis of defendant's testimony. Suffice to say that underlying these transactions and testimony was an investigation by the Internal Revenue Service as to the bona fides of this gift and these "loans" by the plaintiff to the defendant. Much of the evidence is devoted to the details of the showings made by plaintiff and defendant in this respect. At no time was it ever represented that these sums were due and payable on defendant's death. In fact, the contrary appears.

Very persuasive, if not conclusive, proof that the defendant intended that this money be repaid to the plaintiff during her lifetime, as she testified, is the execution of a series of notes to the plaintiff beginning with the inception of the agreement in 1953. Exhibit 42 is a series of four notes, signed by defendant payable to plaintiff in 6 months at 6 percent interest, in sums varying from $2,166.67 on September 1, 1953, to one for $29,046.52 executed on May 6, 1957. Another note, exhibit 43, dated March 16, 1955, in the sum of $28,796.52 and payable in 3 years appears. This note states, "Renew $25,046.52 plus $3,750.00 new loan." On November 1, 1957, defendant executed another renewal note for $28,-266.52 plus a $10,000 loan, in the total sum of $38,266.52, exhibit 44, at 6 percent interest due in 2 years. In none of these notes was there any mention that the obligation was payable on defendant's death.

If any doubt remained, it was cleared up in an affidavit prepared by defendant, through his attorney, to be signed by the plaintiff and then furnished to the Internal Revenue Service. This affidavit listed the notes referred to above and stated, "as listed below and that such amounts and advances are considered by me as legal and bona fide loans to my father which are legally and actually due me as follows." This affidavit was presented to the plaintiff in May 1964 for her signature which was refused. At the same time, however, plaintiff was tendered a note in the sum of $37,079.52, exhibit 26, which

was payable within 10 days of the death of the defendant, which she refused to accept. All of this occurred over 1 year after the defendant had repudiated the entire agreement on April 16, 1963, in a conversation with the plaintiff which is undenied by defendant. Except for the uncertain and equivocal testimony of the defendant, the note of May 1964 is the first appearance of any evidence of intention that the obligation was payable on death. Underlying this case in the background are investigations and representations made to the Internal Revenue Service. In the investigation of 1958-1959, and at other times, it was necessary to establish that the plaintiff was the bona fide owner of this property and that the proceeds of the sales belonged to her. It appears conclusively that the defendant arranged, engineered, and manipulated all of the transactions involved. He was caught in the dilemma of desiring to use and control the property and proceeds as against the necessity to demonstrate divestiture for tax purposes. Interwoven was the desire of the defendant to do something for his daughter and her two children. He concedes that he agreed to finance the college education of the two children.

As defendant states, the basic question here is when the money is due. Both parties ask for a determination of that issue. In determining that question we are aided by the rule that when evidence on material questions of fact is in irreconcilable conflict this court will consider the fact that the trial court observed the witnesses and their manner of testifying and must have accepted one version of the facts rather than the opposite. Western Pipe & Supply, Inc. v. Heart Mountain Oil Co., Inc., 179 Neb. 858, 140 N. W. 2d 813; Hawthorne v. Cassidy, 179 Neb. 245, 137 N. W. 2d 818. Applying this rule, and considering all of the evidence, much of it undisputed, we come to the conclusion that plaintiff has sustained her burden of proof, and that the sums of money, less expenses, delivered to the defendant were repayable

to her when her daughter reached the age of 18 in April 1965.

We proceed to a determination of the amount due. This is not in dispute except for three items. The stipulation shows that $114,361.67 was received by the defendant from the plaintiff, and credits (income taxes and expenses, etc.) in the sum of $25,325.76, with a balance due of $89,035.91. Defendant claims a further credit of $2,534.52, being the balance due on a note from B. H. Buras to the plaintiff. The evidence shows that this was a personal obligation of Buras to plaintiff and defendant admitted never having received it. It was entirely outside the transactions in issue. He had no interest in this transaction whatsoever. He claims that this amount was erroneously charged to him in the accounting contained in the signed stipulation. But the defendant could not identify this item as being charged to him in the list of items recited in the stipulation, nor can we find any reference to it, directly or indirectly, in the stipulation. There is no evidence to support this claim for credit and we disallow it, as the trial court did. The next two items, totaling $10,250 were added to the $89,035.91 figure in the stipulation, by the trial court, to reach the final judgment in the sum of $99,-285.91. The defendant does not deny receiving and owing this additional sum, but contends it involves the sums due from the sale of land not related to the profits arising out of the partnership transaction at issue in this case, and therefore not recoverable in this action. We do not so construe the pleadings in this case. Taken as a whole, the petition alleges numerous transactions stretching over the years, by which plaintiff delivered to defendant various sums pursuant to the original agreement in 1953. She alleges that she is without exact knowledge of these transactions and asks that she "have and recover of the defendant all monies to which she is entitled * * *." The two items involved are "loans" of $250 and $10,000 received by defendant

on May 6, 1957, and November 1, 1957, respectively. In exhibit 29, defendant lists these two items in his own handwriting along with numerous other items admittedly part of the transaction, and shows a balance due of $37,079.52. In exhibit 24, an affidavit of the defendant dated May 12, 1964, he again includes these items as chargeable to him along with other sums admittedly due the plaintiff as the result of this transaction. And defendant testified that exhibit 24 was a correct statement of the transaction at that time, May 12, 1964. There is no doubt that the defendant received this money and that he listed and considered it as a part of the agreement and transactions with the plaintiff. The interpretation given a contract by the parties themselves while engaged in the performance of it is one of the best indications of the true intent of the contract and ordinarily such a construction should be enforced. Lortscher v. Winchell, 178 Neb. 302, 133 N. W. 2d 448. These sums do not appear in the stipulation because it covered only the audit of the partnerships involved, Pirruccello and Company and Buras and Cook, its successor. The trial court was correct in including these sums in the total judgment entered in the sum of $99,285.91.

Finally defendant contends, since a money judgment only was entered, that he was entitled to a jury trial. This is a suit for an accounting. Both parties ask for a determination of the amount due resulting from a large number of interrelated transactions that took place over many years. Both ask for equitable relief. This is a proper basis for equity jurisdiction because of the inadequacy of the remedy at law. See, Corn Belt Products Co. v. Mullins, 172 Neb. 561, 110 N. W. 2d 845; Schmidt v. Henderson, 148 Neb. 343, 27 N. W. 2d 396. There is no merit to this contention.

The judgment of the trial court is correct and is affirmed.

AFFIRMED.