The COOLIDGE COMPANY,
INC., Plaintiff,

v.

Donald MOKRYNSKI a/k/a Harry Donald Mokrynski and Mokrynski & Associates Inc., Defendants.

No. 78 Civ. 4797(MP).

United States District Court,
S. D. New York.

June 29, 1979.

Bloom, Epstein, Wayne, Reiss & Milner, New York City, by Robert M. Milner, New York City, for plaintiff.

Putney, Twombly, Hall & Hirson, New York City, by Donald Stuart Bab, New York City, for defendants.

## DECISION

POLLACK, District Judge.

This is a diversity action by The Coolidge Company, Inc., a mailing list broker, to enforce a restrictive covenant prohibiting the defendant Mokrynski, its former employee, from competing with it for two years after leaving its employ. The complaint seeks damages for losses incurred during the ten and one-half months that Mokrynski and his closely-held corporation, the defendant Mokrynski & Associates, Inc., have competed with the plaintiff and an injunction prohibiting the defendants from competing with it for the balance of the two-year period. Mokrynski has counter-claimed for commissions alleged to be due him on business he placed while still employed by the plaintiff.

The matter was tried to the Court without a jury. Before setting forth specific findings of fact and conclusions of law, it will be useful to describe briefly the business in which the parties are engaged.

There are normally four parties involved in the rental of mailing list. The *list owner* keeps a list of names and addresses, such as a membership list kept by an association or a subscription list maintained by a magazine. The *mailer* pays the list owner for the use of some or all of the names on the owner's list. Mailers include charitable organizations seeking contributions, periodicals seeking new subscribers, retailers seeking orders by catalogue, and many others. If a list owner does not itself want to deal with mailers, it may engage a *list manager*, who will try to rent the list to various mailers. Similarly, if a mailer does not itself want to deal with list owners or managers, it may engage a *list broker*, who will advise the mailer on the best lists for its purposes and arrange with the list owner or manager to rent the list to the mailer.

The plaintiff has been a list broker for over 40 years. It now represents mailers of many different types located throughout the Eastern part of the Nation. In February 1973, the plaintiff hired Mokrynski, who was then unemployed but had a measure of experience in the direct mail order market, to build up its business in the catalogue mail order market, a special branch of the mailing list business. On April 2, 1973, Coolidge and Mokrynski signed a form contract that provided (Emphasis supplied):

.     .     .     .     .

THIRD: that he further acknowledges that such *information*, methods and principles of the Employers' business are confidential and their disclosure to others, or his making use thereof, for himself, outside of his employment is a violation of this agreement, and would be extremely detrimental to the rights and business of the Employers.

The Employee does hereby agree that he will not make *personal use of*, nor will he directly or indirectly furnish or divulge the mailing lists and/or the name of actual or prospective customers who have *dealt with the Employers*; nor will he, during the life of this contract, or at any time in the future, within two years from the termination of his employment, *make personal use of*, or furnish to any person, firm or corporation, the methods of conducting business of the Employers nor furnish any of the mailing list information and/or customers or the manner in which the mailing lists and/or customers are obtained. That *upon termination*

of his employment, the Employee *shall deliver* to the Employers all mailing lists, names or lists of customers, together with *any and all documents, records* and other information pertaining to the business of the Employers to which he had access.

FOURTH: The Employee agrees that for a period of two years following the date of termination of his employment, whether such termination is with or without cause, and in an area consisting of the territory East of the Mississippi River, and including Wisconsin, and Illinois, he will not enter the employ of any person, firm or corporation, or become an officer or director of any corporation, nor be engaged directly or indirectly in any mailing list business similar to that of the Employers; nor shall he solicit mailing lists and customers for such lists; nor offer his services to such companies.

The form contract also included certain clauses that the parties agreed to delete, namely:

WHEREAS, the employee has no knowledge and/or training in the business of the employer or of any similar business, and

.    .    .    .    .

THIRD: That the employee acknowledges that prior to this employment, he had no knowledge of the activities and working of the mailing list broker, nor knew of or had any mailing list or customers heretofore.

Mokrynski worked for Coolidge until August 17, 1978, when he left without prior indication of such intention and formed Mokrynski & Associates, Inc., to compete with Coolidge as a list broker, primarily in the catalogue mail order field. There is significant evidence that Mokrynski readied himself for the change by arranging before severing his employment from plaintiff to lease premises for his new enterprise, print up stationery, incorporate his new venture, and shortly after leaving to obtain the business of the employer's customers in this field and to take over the only other executive in the catalogue mail order department, his secretary and assistant, employed by the plaintiff, to service the new business. The inferences are clear that the bulk of the plaintiff's expectancy of business from the customers of the house was appropriated by the defendants, and the plaintiffs within a brief period were deprived of and no longer had the customers that had been built up at its expense during Mokrynski's tenure; indeed the plaintiff no longer enjoyed a catalogue mail order business. All of this was plainly in breach of Mokrynski's fiduciary obligations to and contractual commitments with plaintiff.

Mokrynski's compensation had been increased several times during his five and one-half years at Coolidge. His starting salary in 1973 was $16,000 per year against a commission arrangement based on the volume of the earnings of the catalogue mail order division. As of January 1, 1978, the effective date of his last increase in the fixed compensation, Mokrynski was to receive 30% of all revenue that Coolidge earned on business that he produced; plus fifty cents per 1,000 names rented from lists that Mokrynski had arranged to be available exclusively to Coolidge; plus reimbursement for reasonable expenses and participation in Coolidge's profit-sharing trust.

After January 1, 1978, Mokrynski asked for a further increase in fixed compensation and the opportunity to buy stock in the Coolidge Company. Coolidge offered Mokrynski a compensation package consisting of $100,000 in commissions, $5,000 for a car; $20,000 in expenses; $15,000 from the profit-sharing trust; and the right to buy up to three shares of Coolidge stock at the then-current book value. Mokrynski rejected this offer, saying that it amounted to less than he was earning under the formula that took effect on January 1, 1978. No change in that formula was thereafter agreed upon by Coolidge and Mokrynski.

During the seven and one-half months of 1978 before he resigned, Mokrynski produced business for which Coolidge billed at least $265,000, 30% of which is $79,500. Coolidge paid Mokrynski $58,445.73 on account of this business. Mokrynski also

arranged for the rental of 9,509,000 names from the exclusive lists, for which he would have been paid $4,754.50 under the agreement effective January 1, 1978, but for which Coolidge has paid him nothing.

As may be inferred from the foregoing figures, Mokrynski substantially built up his department in Coolidge's business with catalogue mailers during his five and one-half years there. Although he was successful in the catalogue specialty, Mokrynski was not a unique or irreplaceable broker in the mail order business generally. However, there are said to be only about ten other brokers who specialize in the catalogue field. Experience in other branches of the mailing list business can be applied to catalogue mailing but only with a measure of lead time to develop and with some additional training employees in the general field may serve the catalogue specialty; there is an institute that endeavors to supply this and other training in the mailing list business.

The plaintiff concedes that the names of list owners and potential mailers are in the public domain. It asserts, however, that in the course of its business, the Coolidge Company or its employees maintain three categories of confidential records. These are "list usage data" (i. e., the different mailers that have used a particular list, how many names on the list each mailer has used, when the mailings took place); "customer usage data" (i. e., the lists that a particular mailer has used, how many names on each list it has used, when its mailings took place); and "list response data" (i. e., the degree of success that a particular mailer has had with the various lists it has used). The former two categories of internal information are maintained in the central files of the company; the "list response data" are maintained by each individual broker on some of the individual mailers he services.

The evidence shows, however, that the "list usage data" are not confidential at all and that only some of the "customer usage data" and "list response data" are realistically to be considered confidential. "List usage data" are maintained not only by list brokers, but also by list owners and managers, who freely report this information to list brokers in their efforts to rent lists. "Customer usage data" are maintained by each mailer, which may report this information to brokers to guide their recommendation of new lists to rent. Each mailer may also maintain "list response data" on its own mailings and may share this information with its brokers. A broker of long standing like Coolidge, however, also has accumulated "customer usage data" and "list response data" for many mailers other than the one for whom it is working at any given time. In recommending a new list to a particular mailer, such a broker is guided by its data on other, comparable mailers (even though it would be unethical to disclose the actual data on one mailer to another).

The usefulness of this confidential information to the broker tends to diminish with time. Most list owners update their lists every six months, and some do so every three months. As new mailings are made, new response data supersede those previously maintained.

There is no direct evidence that Mokrynski removed, copied or memorized any of this confidential information. He admits, however, that while at Coolidge he regularly destroyed "list response data" that he maintained on the clients that he served there. The only excuse that Mokrynski can offer for this destruction of records is the strange contention that he believed that the information had been given in confidence to him personally, rather than to him as an employee of Coolidge, to be kept confidential from his employer. The inference is clear that on his way out of the plaintiff's employ, Mokrynski undertook to frustrate or hobble any opportunity of his employer to continue to adequately service the customers of the department and to retain them as customers of the plaintiff.

The law of New York on covenants not to compete, which applies in this case, *see Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 300 N.Y.S.2d 817,

248 N.E.2d 576 (1969), was stated most recently by the Court of Appeals in *Columbia Ribbon & Carbon Mfg. Co. v. A–1–A Corp.*, 42 N.Y.2d 496, 499, 398 N.Y.S.2d 1004, 1006–07, 369 N.E.2d 4, 6 (1977):

> Since there are "powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood" . . . restrictive covenants which tend to prevent an employee from pursuing a similar vocation after termination of employment are disfavored by the law . . . . Such covenants will be enforced only if reasonably limited temporally and geographically . . . , and then only to the extent necessary to protect the employer from unfair competition which stems from the employee's use or disclosure of trade secrets or confidential customer lists . . . . Thus, where the employer's past or prospective customers' names are readily ascertainable from sources outside its business, trade secret protection will not attach and their solicitation by the employee will not be enjoined. . . .
>
> On the other hand, if the employee's services are truly " 'special, unique or extraordinary' " and not merely of "high value to his employer", injunctive relief may be available though trade secrets are not involved.

*See also Reed, Roberts Assocs., Inc. v. Strauman*, 40 N.Y.2d 303, 386 N.Y.S.2d 677, 353 N.E.2d 590 (1976); *Karpinsky v. Ingrasci*, 28 N.Y.2d 45, 320 N.Y.S.2d 1, 268 N.E.2d 751 (1971).

■ If the Court finds that it would be reasonable to enforce the covenant only in part, it has the "power to 'sever' the impermissible from the valid and uphold the covenant to the extent that it is reasonable." *Karpinsky v. Ingrasci, supra*, 28 N.Y.2d at 51, 320 N.Y.S.2d at 6, 268 N.E.2d at 754; *see also USAchem, Inc. v. Goldstein*, 512 F.2d 163, 168 (2d Cir. 1975).

■ The covenant in this case may reasonably be enforced to the extent necessary to protect Coolidge from Mokrynski's use of its confidential information—so contractually labelled in the contract binding the parties. The covenant is reasonable in its geographical scope, since Coolidge draws its clientele from throughout the designated area—States east of the Mississippi, plus Wisconsin and Illinois. *See Karpinsky v. Ingrasci, supra*, 28 N.Y.2d at 50, 320 N.Y.S.2d at 5, 268 N.E.2d 751. The covenant as written is not reasonable, however, either in its temporal scope or in the scope of the activities, beyond those in the catalogue mail order business, from which it precludes Mokrynski. As noted above, the usefulness of Coolidge's information diminishes in the course of a year because during that time at least two revisions of each list take place and new information from more recent mailings is accumulated. The covenant precludes Mokrynski from engaging "in any mailing list business similar to that of the" plaintiff. As Coolidge now concedes, it would not be reasonable to preclude Mokrynski from any branch of the mailing list business other than the catalogue mail order specialty, since it was only in that branch of the business that Coolidge employed Mokrynski and gave him access to its confidential information. The contract must be deemed to have been written to protect this aspect of plaintiff's business.

Accordingly, the defendants will be, and hereby are, enjoined until August 17, 1979, from acting directly or indirectly as mailing list brokers for or on behalf of actual or prospective mailers of catalogues generally and until August 17, 1980, from acting directly or indirectly as mailing list brokers for and on behalf of the former clients of the plaintiff. In addition, Mokrynski will be liable to the plaintiff for damages resulting from his breach of the covenant from August 17, 1978, to the present, namely, the profit the defendants have made from acting as mailing list brokers for or on behalf of mailers of catalogues including those who were customers of the plaintiff on August 17, 1978, and any expenses that plaintiff can establish as having been incurred in futile attempts to regain their customers from defendants after Mokrynski took them over. The parties will appear before a Magistrate for an accounting of these profits and expenses unless the parties are able to reach a stipulation thereon or settlement thereof.

On the counterclaims, the plaintiff admits that Mokrynski earned commissions that it has not paid, but argues that he should forfeit these commissions because of his disloyalty. The damages that the Court has awarded the plaintiff will fully compensate it for Mokrynski's breach of his covenant, insofar as the covenant was reasonable. It would enrich the plaintiff unjustly to add to these damages the commissions that Mokrynski earned by producing business from which the plaintiff profited. *Cf. Feiger v. Iral Jewelry, Ltd.*, 85 Misc.2d 994, 382 N.Y.S.2d 216 (Sup.Ct. N.Y.Co. 1975), *aff'd on opinion below*, 52 A.D.2d 524, 382 N.Y.S.2d 221 (1st Dep't 1976), *aff'd*, 41 N.Y.2d 928, 394 N.Y.S.2d 626, 363 N.E.2d 350 (1977) (per curiam). Accordingly, the plaintiff's damages will be offset by the $4,754.50 due Mokrynski for arranging the rental of names from Coolidge's exclusive lists and by whatever sums the Magistrate or the stipulation of the parties determines to be due Mokrynski as commissions on other business.

The foregoing shall constitute the findings of fact and conclusions of law required by Federal Rules of Civil Procedure 52(a).

Settle judgment accordingly on or before July 10, 1979, on notice.

SO ORDERED.