PHILIP G. JOHNSON & CO., A PARTNERSHIP, APPELLANT AND CROSS-APPELLEE, v. ROBERT S. SALMEN, APPELLEE AND CROSS-APPELLANT.

317 N.W.2d 900

Filed April 2, 1982. No. 44083.

Sutter & Olson, for appellant.

Fitzke & Langvardt, for appellee.

Heard before BOSLAUGH, MCCOWN, WHITE, and CAPORALE, JJ., and FINN, D.J.

CAPORALE, J.

The plaintiff-appellant, Philip G. Johnson & Co. (Johnson), brought an action for an accounting and to recover damages from one of its former partners, Robert S. Salmen, the defendant-appellee. Salmen counterclaimed for damages and prejudgment interest.

Johnson appeals from the decree of the trial court which refused to enforce a restrictive covenant contained in the partnership agreement between it and Salmen. Salmen cross-appeals from that portion of the decree which denies him recovery of a share of the proceeds resulting from the sale of certain partnership assets and denies prejudgment interest.

Johnson urges, in summary, that the trial court erred in (1) refusing to enforce the restrictive covenant, (2) excluding certain testimony, and (3) awarding damages to Salmen. Salmen, on the other hand, urges the trial court erred in computing his damages and in refusing prejudgment interest.

An action for an accounting may, under one set of circumstances, find its remedy in an action at law and, under another, find it within the jurisdiction of equity. Where, as here, the intimate relationships of the parties are involved, an adequate remedy was available only within the equitable jurisdiction of the court. See, *Cook v. Wilkie,* 181 Neb. 596, 150 N.W.2d 124 (1967); *Corn Belt Products Co. v. Mullins,* 172 Neb. 561, 110 N.W.2d 845 (1961); *Schmidt v. Henderson,* 148 Neb. 343, 27 N.W.2d 396 (1947). Accordingly, we review the record de novo and reach an in-

dependent conclusion without being influenced by the findings of the trial court, except, however, that where credible evidence is in conflict, we must give weight to the fact the trial court saw the witnesses and observed their demeanor while testifying. *Sturm v. Mau,* 209 Neb. 865, 312 N.W.2d 272 (1981); *Schmidt v. Henderson, supra.*

Prior to becoming associated with Johnson, which engages in the practice of accounting, Salmen had practiced that profession in Grand Island as a sole practitioner for approximately a year. In the summer of 1969 Salmen merged his Grand Island practice with that of Johnson and moved to Hastings. Johnson has had offices in eight different Nebraska cities and has several clients who are now in a number of states.

A long period of negotiations ensued during which a number of proposals were made by Salmen and acceded to by Johnson. A partnership agreement between Johnson and Salmen was signed, effective July 1, 1975, which contains a restrictive covenant. It provides as follows:

"11.1 In the event that a partner withdraws from the partnership, or if a partner retires under the provisions of Section 9.4, it is mutually agreed that he will not for a period of three years from the date of his retirement or withdrawal from the firm take any action which may disturb the existing business relations between the firm or its successors, if any, and any of its clients, and specifically he will not during such three year period, directly or indirectly solicit or accept any professional engagements from clients or former clients of the partnership, or from officers and agents of such clients, nor will he perform such services as an employee, partner of, or associate of another firm or person doing accounting work for any client or former client of the firm, or an officer or agent of such client, nor will he take a position as an employee or paid officer or ad-

visor of such client without authorization from the partnership.

"In the event that this covenant is breached, then upon the commencement of work or services for a client or former client of the firm, either by such partner on his own account or by another partnership including such partner, or by an individual accountant or firm of accountants with whom such partner is an employee, or by such partner's joining or becoming an employee of an accounting firm already doing work for such client or former client, or by becoming an employee, officer or advisor of such client or former client, such partner agrees to pay the partnership as an acquisition cost of such business an amount equal to the greater of (1) the total amount of fees received from such client, computed on an accrual basis during the three-year period immediately preceding the date of retirement or withdrawal from the firm; or (2) the total amount of fees, salary or other remuneration received by the retiring or withdrawing partner from such client or former client computed on an accrual basis for a three-year period subsequent to the date of withdrawal or retirement. Said amount is to be paid in estimated quarterly installments computed on the total amount determined under alternative (1) hereof for a three-year period commencing from the date of withdrawal or retirement, and the final payment shall include an additional payment in the event that alternative (2) exceeds alternative (1).

"Also any partner breaching this covenant in addition to payment of an acquisition cost as above outlined, shall forfeit any right to profit participation under the provisions of Sections 9.1(a) and (c) of this agreement.

"11.2 If at the time any withdrawn or retired partner breaches this covenant there are other partners who are disabled, retired or deceased and payments are being made to them or their estates under

the provisions hereof, the partner who has breached this covenant shall be personally liable to each other disabled or retired partner and the estate of each other deceased partner for any reduction in profit participation in the years subsequent to the breach due to a reduction of the partnership income in any said year below the partnership income for the year immediately preceding the breach of this covenant. In the event that any payment is due under this section from the partner who has breached this covenant to said retired or disabled partner or the estate of a deceased partner, the amount so due shall be paid within 60 days after the close of the partnership's fiscal year."

Salmen withdrew from the partnership effective December 31, 1976. Following that departure he accepted professional employment from clients who were previously served by Johnson.

Prior to Salmen's withdrawal Johnson had reached an agreement, to be effective January 1, 1977, for the sale of its Scottsbluff office. Johnson also had a claim for insurance proceeds due to a fire loss, but it had not set the claim up as an asset, under its accrual method, by December 31, 1976. The value of Salmen's capital account, as computed by Johnson, was $21,502.57 plus $5,860 for Salmen's units of participation, or a total of $27,362.57. The trial court awarded Salmen $38,862.57, which included $3,500 as his share of the fire loss recovery and $8,000 as the value of his units of participation.

Appellant argues that the provision in question is not a covenant not to compete in that it does not purport to prohibit Salmen from entering the field of accounting, but merely obligates him to turn over the fees he earns from servicing certain clients during the 3 years following withdrawal from the partnership. Secondly, appellant urges that this is a case of first impression in this jurisdiction, as the arrangement concerns not an employer and employee, but

partners. As to the first position, we consider the distinction put forth by appellant to be artificial and meaningless in any real sense. The effect of the provision, if valid, is to prevent Salmen from earning income by competing for clients served by Johnson at any time. As to the second argument, we reviewed a covenant not to compete between partners in *Adams v. Adams,* 156 Neb. 778, 58 N.W.2d 172 (1953). We held therein that the covenant did not prohibit the covenantor from loaning money to others engaged in competition with the covenantee, and that the covenant did not prevent the covenantor's wife from using her surname in connection with a competing business. More importantly, a partner with such a minor interest as that held by Salmen is in a real sense no different than an employee.

At the early common law, a contract in restraint of trade was held to be against public policy and void. Over the years we have developed a balancing test and have held that such restraints, if reasonable, are enforceable. The considerations to be balanced are the degree of inequality in bargaining power; the risk of the covenantee losing customers; the extent of respective participation by the parties in securing and retaining customers; the good faith of the covenantee; the existence of sources or general knowledge pertaining to the identity of customers; the nature and extent of the business position held by the covenantor; the covenantor's training, health, education, and needs of his family; the current conditions of employment; the necessity of the covenantor changing his calling or residence; and the correspondence of the restraint with the need for protecting the legitimate interests of the covenantee. *Welcome Wagon International, Inc. v. Hostesses, Inc.,* 199 Neb. 27, 255 N.W.2d 865 (1977); *Brewer v. Tracy,* 198 Neb. 503, 253 N.W.2d 319 (1977); *Diamond Match Div. of Diamond International Corp. v. Bernstein,* 196 Neb. 452, 243 N.W.2d

764 (1976) (applying New York law); *Farmers Underwriters Assn. v. Eckel,* 185 Neb. 531, 177 N.W.2d 274 (1970); *Securities Acceptance Corp. v. Brown,* 171 Neb. 406, 106 N.W.2d 456 (1960), *clarified and rehearing denied* 171 Neb. 701, 107 N.W.2d 540 (1961); *Roberts v. Lemont,* 73 Neb. 365, 102 N.W. 770 (1905).

We have also held that a contract to restrict a laborer from engaging in an occupation, if valid at all, must be restricted to the area in which the personal service was performed. See *Welcome Wagon International, Inc. v. Hostesses, Inc., supra,* wherein we held invalid a covenant that the employee would not compete with her former employer in the solicitation of newcomers to community businesses not only in the city in which she had rendered her services but where her former employer was then operating or had signified an intention to operate. See *Brewer v. Tracy, supra,* wherein we refused to restrict an employee engaged in refuse and trash hauling from competing in areas which neither the employer nor the employee served. The covenant in question undertakes to prohibit Salmen from earning fees from clients or former clients of the partnership, or from such clients' officers and agents, no matter where they may be. Whatever interest Johnson may have in its present clients, it certainly can have none in its former clients; in any event, the forfeiture of fees is not limited to those generated from serving Johnson clients in Hastings, where Salmen rendered his personal services. It may well be that the nature of the accounting practice is such that a partner may serve clients in cities other than where he offices. That fact, however, does not meet the objection that the restriction includes services to former Johnson clients and clients which Salmen had not served and did not know. On that ground alone, the covenant is impermissibly broad and is therefore unreasonable and unenforceable.

Johnson suggests that if the restrictive covenant is

too broad, the court may modify it so as to make it reasonable. A number of courts have, on a variety of theories, undertaken to rewrite unreasonable restraints into reasonable ones. 6A A. Corbin, *Contracts* § 1390 (1962). Illustrative of such cases are the following: *Alside, Inc. v. Larson,* 300 Minn. 285, 220 N.W.2d 274 (1974) (limiting geographical area); *Fullerton Lumber Co. v. Torborg,* 270 Wis. 133, 70 N.W.2d 585 (1955), *Lewis v. Krueger,* 153 Tex. 363, 269 S.W.2d 798 (1954), *Ceresia v. Mitchell,* 242 S.W.2d 359 (Ky. 1951), *Coolidge Co., Inc. v. Mokrynski,* 472 F. Supp. 459 (S.D. N.Y. 1979) (reducing period of time); *Toch v. Eric Schuster Corporation,* 490 S.W.2d 618 (Tex. Civ. App. 1972), *Wood v. May,* 73 Wash. 2d 307, 438 P.2d 587 (1968) (limiting geographical area and reducing period of time); *Hebb v. Stump, Harvey & Cook,* 25 Md. App. 478, 334 A.2d 563 (1975) (excluding customers generated by employee).

Johnson relies on certain dicta in *Securities Acceptance Corp., supra,* for the proposition that Nebraska has adopted the rule that a court of equity may reform an unreasonable restrictive covenant so as to make it reasonable and enforceable. It is true that *Securities Acceptance Corp.* quotes from *Gallagher v. Vogel,* 157 Neb. 670, 61 N.W.2d 245 (1953), which in turn cites *Morse v. General American Life Ins. Co.,* 130 Neb. 37, 263 N.W. 676 (1935), a case construing a policy of insurance, general language to the effect that a contract should be given a reasonable construction so as to give effect to the intentions of the parties rather than to defeat them. *Securities Acceptance Corp.* also quotes from a Massachusetts case, *Whiting Milk Co. v. O'Connell,* 277 Mass. 570, 179 N.E. 169 (1931), stating that a contract in restraint of trade in which the territory is unreasonably extensive may be divisible as to space and enforced in equity within a reasonable area. The fact remains, however, that the court in *Securities Acceptance Corp.* did not rewrite the restrictive

covenant involved in that case and did not enforce it. Neither did it do so in *Welcome Wagon International, Inc. v. Hostesses, Inc., supra,* or *Brewer v. Tracy, supra.* Whatever might be the situation in an appropriate case, the instant matter is not one wherein we are disposed, should we ever be, to rewrite the contract. Far too many variables are involved; among them are geographical area, period of time, classes of clients, percentage of fees to be forfeited, and to whom such fees must be paid.

Having reached this conclusion, it is unnecessary to consider Johnson's other assignments of error except with respect to the amount of damages awarded to Salmen, which we consider in connection with Salmen's contentions on his cross-appeal.

The evidence is clear that the sale of the Scottsbluff office was not to become effective until after Salmen's withdrawal from Johnson. The trial court correctly determined that Salmen was not entitled to participate in the proceeds of that sale. The evidence likewise establishes that at the time of Salmen's withdrawal, the proceeds of the fire loss insurance recovery had not yet accrued to Johnson. The court erred in awarding Salmen $3,500 as his share of such recovery.

We determine the value of Salmen's units of participation as of December 31, 1976, to have been $5,860 rather than $8,000 as determined by the trial court. We find Salmen is entitled to recover from Johnson the sum of $27,362.57, and the trial court's judgment is modified accordingly.

Prejudgment interest is allowable only when the amount of the claim is liquidated. Neb. Rev. Stat. § 45-104 (Reissue 1978). Where a reasonable controversy exists as to the plaintiff's right to recover and as to the amount of such recovery, the claim is generally considered to be unliquidated and prejudgment interest is not allowed. *Omaha Paper Stock Co. v. Harbor Ins. Co.,* 596 F.2d 283 (8th Cir. 1979);

*Frank McGill, Inc. v. Nucor Corp.,* 195 Neb. 448, 238 N.W.2d 894 (1976). The trial court correctly disallowed prejudgment interest.

AFFIRMED AS MODIFIED.