LEON M. REIMER & CO.,
P.C., Plaintiff,

v.

Joseph P. CIPOLLA, Jr., Defendant.

No. 94 CV 7073.

United States District Court,
S.D. New York.

June 6, 1996.

Stephen J. King, Frydman Beck King & Arad, New York, NY, for Plaintiff.

Joseph P. Cipolla, Paramus, NJ, pro se.

## MEMORANDUM DECISION AND ORDER

PARKER, District Judge.

Plaintiff, Leon Reimer & Co., P.C. ("Reimer") brings this diversity action against *pro se* Defendant, Joseph P. Cipolla, Jr., ("Cipolla") seeking declaratory and injunctive relief and damages arising out of an alleged breach of contract and breach of fiduciary duties. Cipolla moves for summary judgment pursuant to Rule 56 of the Fed.R.Civ.P. For the reasons stated below, the motion is denied in part and granted in part.

## BACKGROUND

Cipolla, a certified public accountant, worked for Reimer, a Certified Public Accounting firm, from October 7, 1990 through July 15 1994. The present dispute arises from two provisions in Reimer's employment agreement.[1] The first, Section 3, provides:

> (a) In the event Employee accepts an engagement from a client of the Corporation during the two (2) year period following

---

1. On February 27, 1991 Reimer required Cipolla to sign an agreement. ("the 1991 Agreement"). On September 11, 1992, Cipolla signed an agreement, almost identical to the 1991 Agreement ("the 1992 Agreement"), except that it referred to "him as an Employee/Stockholder" rather than simply as an "Employee." In 1992 Reimer also signed a Shareholders Agreement which required that Cipolla "abide by the terms of the restrictive covenant and Confidentiality Agreement" of the 1991 Agreement.

the Termination Date, Employee shall immediately advise the Corporation and pay to the Corporation, one and one half (1½) times the annual gross fees charged to such client by the Corporation during the last full year (twelve consecutive months) in which such client employed the services of the Corporation. Such payment to the Corporation shall be made by Employee within fifteen (15) days of his/her accepting any such engagement.

(b) Employee shall be exempt from paying such amount described in Section 3(a) above if: (i) Employee has obtained Leon Reimer's express written confirmation that Employee was responsible for bringing said client to the Corporation; and (ii) said written confirmation was given to Employee prior to said client becoming a client of the Corporation.

The second, Section 2, provides in part:

Employee will use the Confidential Information only while working for the Corporation and only in connection with his/her duties related thereto and will cease using said information on the day that Employee ceases to work for the corporation. Employee agrees to promptly return all books, records, documents, and property of the Corporation on the Termination Date. Furthermore, such Confidential Information shall at no time be disclosed to any unauthorized person.

Cohane Rafferty was a client of Reimer, serviced by Cipolla. When Cipolla left Reimer in July, 1994, he told certain of his clients, including Cohane Rafferty, that he was leaving Reimer and joining a new partnership, Cipolla, Burke, Grbelja & Co. ("Cipolla Burke"). Subsequently, certain clients retained Cipolla Burke. Cipolla's solicitation and retention of these clients occurred without the knowledge and consent of Reimer. Moreover, before leaving Reimer, Cipolla apparently copied and took with him certain Reimer files generated as a result of its work for Cohane Rafferty. This litigation followed.

---

**2.** In Count Four of his complaint, Reimer seeks a declaration that the agreements in question are legally enforceable.

## DISCUSSION

### A. Summary Judgment Standard

 Under Rule 56(c) of the Federal Rules of Civil Procedure, a "motion for summary judgment must be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must initially satisfy a burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986), see also *Gallo v. Prudential Residential Servs. Ltd.*, 22 F.3d 1219, 1223 (2d Cir.1994). The nonmoving party must meet a burden of coming forward with "specific facts, showing that there is a genuine issue of fact for trial," Fed.R.Civ.P. 56(e) by a showing sufficient to establish the existence of [every] element essential to the party's case, and on, which the party will bear the burden of proof at trial.

 In deciding whether a genuine issue of material fact exists, "the court is required to draw all factual inferences in favor of the party against whom summary judgment is sought." *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989). The Court is to inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for the party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986), however, and to grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative. *Knight v. United States Fire Ins.*, 804 F.2d 9, 12–15 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

### B. Section 3

Counts (sic) One and Three [2] of the complaint allege that Cipolla violated Section 3 of

the Agreements.[3] Cipolla argues that since Section 3 is overly broad and overly restrictive, it is unenforceable. At the outset, we note that Section 3 does not expressly prohibit Cipolla from providing accounting services to Reimer's clients. Rather it provides that if he does so in the absence of advance, written permission, Cipolla must pay Reimer one and one half times the annual gross fees charged to that client by Reimer during the last full year in which that client employed Reimer's services. Most courts have analyzed such provisions in accounting firm agreements as covenants not to compete that must be reasonable in terms of restraint of trade principles in order to be enforceable. See *Rhoads v. Clifton, Gunderson & Co.*, 89 Ill.App.3d 751, 44 Ill.Dec. 914, 411 N.E.2d 1380 (1980); *Holloway v. Faw, Casson & Co.*, 319 Md. 324, 355, 572 A.2d 510, 514–15 (Sup. Ct.Md.1990); *Philip G. Johnson & Co. v. Salmen*, 211 Neb. 123, 127–28, 317 N.W.2d 900, 903 (Sup.Ct.Neb.1982); *Smith, Batchelder & Rugg v. Foster*, 119 N.H. 679, 683–84, 406 A.2d 1310, 1312–13 (Sup.Ct.N.H.1979); *McElreath v. Riquelmy*, 444 S.W.2d 853 (Tex.Civ.App.1969); *Foti v. Cook*, 220 Va. 800, 263 S.E.2d 430 (Sup.Ct.Va.1980); *Perry v. Moran*, 109 Wash.2d 691, 748 P.2d 224 (1987), *modified on other grounds on reconsideration*, 111 Wash.2d 885, 766 P.2d 1096 (1989), *cert. denied*, 492 U.S. 911, 109 S.Ct. 3228, 106 L.Ed.2d 577 (1989); see also *Olliver/Pilcher Indus. v. Daniels*, 148 Ariz. 530, 531–32, 715 P.2d 1218, 1219–20 (Ariz.1986).

Both Reimer and Cipolla, however, seem to agree that Section 3 is appropriately characterized as something other than a covenant not to compete. Cipolla argues that it is an unenforceable penalty and Reimer argues that it is a reimbursement clause. Nonetheless, even those courts that have declined to define similar provisions as restraints on trade have still required them to be reasonable to be enforced. See *Follmer, Rudzewicz & Co. v. Kosco*, 420 Mich. 394, 408, 362 N.W.2d 676, 683 (1984) ("whether such an agreement is characterized as in restraint on trade or not, it must be reasonable to be enforced"); *Dobbins, DeGuire & Tucker, P.C. v. Rutherford, MacDonald & Olson*, 218 Mont. 392, 708 P.2d 577 (Sup.Ct.Mont.1985); *Isler v. Shuck*, 38 Or.App. 233, 589 P.2d 1180, 1182–83 (Sup.Ct.Or.1979). The reasonableness test adopted by those courts, however, are "essentially indistinguishable from the ones applied to covenants not to compete." See *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 385 (Sup.Ct.Tex.1991) (citing Annotation, Covenants To Reimburse Former Employer For Lost Business, 52 A.L.R. 142 (1987)).[4] Accordingly, we analyze the Agreements in question for their reasonableness.

Parties to employment contracts have considerable latitude in structuring and controlling their relationships. However, it is well established that agreements which restrict employment opportunities are generally disfavored. See *Consol. Brands, Inc. v. Mondi*, 638 F.Supp. 152, 156 (E.D.N.Y.1986) ("such covenants are viewed unfavorably by the New York Courts and are not liberally construed"); *Columbia Ribbon & Carbon Mfg. Co. v. A–1–A Corp.*, 42 N.Y.2d 496, 398 N.Y.S.2d 1004, 1006, 369 N.E.2d 4, 6 (Ct.App. 1977) ("[R]estrictive covenants which tend to prevent an employee from pursuing a similar vocation after termination of employment are disfavored by the law"); *Contempo Com. v. MJM Creative Services*, 182 A.D.2d 351, 582 N.Y.S.2d 667 (A.D. 1 Dept.1992); *Metropolitan Medical Group v. Eaton*, 154 A.D.2d 252, 546 N.Y.S.2d 90 (A.D. 1 Dept.1989).

---

3. Count One alleges that Cipolla breached Section 3(a) of the agreement when Cipolla Burke performed services for the Cohane Rafferty Clients. Count Three alleges that Cipolla breached when Cipolla Burke performed services for other businesses and individuals who had previously been clients of Plaintiff.

4. The Texas Supreme Court further explained:
 Even where there is no express provision that the departing partner or employee is prohibited from competing, the conduct for which such damages are assessed is competing by furnishing accounting services to clients of the former client's business. If the damages provided are sufficiently severe, the economic penalty's deterrent effect functions as a covenant not to compete as surely as if the agreement stated that the departing employee will not compete. The practical and economic reality of such a provision is that it inhibits competition virtually the same as a covenant not to compete.

■ To be reasonable, an agreement not to compete must satisfy each of four conditions: "(1) the time and geographical scope of the restriction must be reasonable; (2) the burden on the employee must not be unreasonable; (3) the general public must not be harmed; and (4) the restriction must be necessary for the employer's protection." *Mallory Factor, Inc. v. Schwartz,* 146 A.D.2d 465, 536 N.Y.S.2d 752, 753 (1989) (citations omitted) [5]; *American Institute of Chemical Engineers v. Reber–Friel Co.,* 682 F.2d 382, 387 (2d Cir.1982); *Innovative Networks, Inc. v. Satellite Airlines Ticketing Centers,* 871 F.Supp. 709, 728 (S.D.N.Y.1995).

The record does not suggest that enforcement of Section 3 imposes unreasonable time limitations, nor does Cipolla document general harm to the public.[6] The relevant concerns here are the related questions of whether the means Reimer fashioned are reasonable ones for the protection of its business.

■ We will first examine the legitimate business interests that Reimer needs to protect. New York courts typically do not require any novelty in the ex-employees services nor must any confidential or customer information be demonstrated before a restrictive covenant may be enforced. See *Arthur Young & Co. v. Black,* 97 A.D.2d 369, 466 N.Y.S.2d 10 (1st Dept.1983), *appeal dismissed,* 61 N.Y.2d 712, 472 N.Y.S.2d 620, 460 N.E.2d 1105 (1984) and *Arthur Young & Co. v. Galasso,* 142 Misc.2d 738, 538 N.Y.S.2d 424 (Sup.Ct.1989).

Here, Reimer placed Cipolla in a position of trust and confidence that permitted him to establish a professional rapport with Reimer clients. Consequently, Reimer was clearly entitled to set the terms on which it would employ Cipolla and Reimer was also entitled reasonably to protect itself from the risk that an employee such as Cipolla may later abuse his position and misappropriate the benefits of relationships developed at Reimer's expense. See *Singer v. Habif, Arogeti & Wynne P.C.,* 250 Ga. 376, 297 S.E.2d 473 (Sup.Ct.Ga.1982); and *Rhoads v. Clifton, Gunderson & Co.,* 89 Ill.App.3d 751, 44 Ill. Dec. 914, 411 N.E.2d 1380 (Ill.App.1980).

Reimer, however, has done far more than protect itself against these risks. First, the agreement provides that Cipolla must reimburse Reimer for all fees earned from Reimer clients. This provision would prohibit Cipolla from accepting an engagement from a Reimer client who voluntarily and without any prior solicitation by Cipolla contacts him and seeks to retain him. See *Deloitte & Touche, L.L.P. v. Chiampou,* —— A.D.2d ——, 636 N.Y.S.2d 679 (4th Dept.App.Div. 1995) (preliminary injunction to enforce covenant not to compete proper to extent that it exempted "plaintiff's former clients who had voluntarily and without solicitation sought out defendants after defendants left plaintiff's employ"). To the extent that this provision prohibits considerably more than the active solicitation or diversion of clients, we find it unreasonable. It overprotects Reimer's interests and unreasonably limits Cipolla's and former Reimer clients' ability to choose professional services. See *Peat Mar-*

5. In *Mallory,* the defendant was hired as an account executive for a public relations firm. As part of an employment agreement, he agreed that, "upon termination of his employment, he would not solicit any [Mallory] account for a period of eighteen months." *Id.* 536 N.Y.S.2d at 752. While still employed by Mallory, the defendant traveled to St. Maarten with a competing firm to discuss transferring a Mallory account to that firm. Mallory sued alleging, in part, that the defendant had both breached his fiduciary duty of loyalty and had breached the eighteen month restrictive covenant contained in his employment agreement.

Using this four factor analysis, the *Mallory* court held that the restrictive covenant between this public relations firm and its account execu-

tive was reasonably designed to protect against the misuse of Mallory Factor's trade secrets and goodwill. *Mallory* 536 N.Y.S.2d at 753–54. The court reasoned that the time restriction of eighteen month time period was relatively short, no geographical restriction existed, Schwartz was only prohibited from performing work for any account he had been involved with while employed by Mallory Factor Inc., and no harm would be imposed on the general public. *Id.* 536 N.Y.S.2d at 754.

6. Some courts have found that these agreements harm the general public because the public's ability to choose accountants is adversely affected. See *Smith, Batchelder & Rugg,* 119 N.H. at 685, 406 A.2d at 1313. However, because the record does not address this issue, neither do we.

*wick Main & Company,* 818 S.W.2d at 388; *Singer,* 250 Ga. at 376–78, 297 S.E.2d at 475 (Sup.Ct.Ga.1982).[7]

In addition, this covenant is unreasonable "considering the business sought to be protected" because it prohibits Cipolla from working for entities with whom he had no contract while at Reimer. Reasonable attempts to limit a former employee's solicitation of client's he was exposed to is one thing. Expanding that restriction to any of the firm's clients regardless of the nature of the work done or the identity of the professional who may have performed the services and then buttressing the restrictions with the requirement of a potentially large advance payment bearing no reasonable relation to any gain to Cipolla or loss to Reimer is quite a different thing. See *Polly v. Ray D. Hilderman & Company,* 225 Neb. 662, 667, 407 N.W.2d 751, 755 (Sup.Ct.Neb.1987) (agreement is "valid only if it restricts the former employee from working for or soliciting the former employee's accounts with whom the former employee actually did business and has personal contact").

Moreover, the agreement does not specify whether Cipolla is precluded from serving any dormant or occasional clients the Reimer firm ever had or only its active clients.

While a relationship with present clients may be an interest that is properly protectible in some fashion, Section 3(a), to the extent that it can be read broadly to restrain former employees from serving any dormant client without restriction, is overbroad. See *Seach v. Richards, Dieterle & Co.,* 439 N.E.2d 208 (Ct.App.In.1982); *Smith, Batchelder & Rugg v. Foster,* 119 N.H. 679, 406 A.2d 1310 (Sup. Ct.N.H.1979); see also *NCR Corp. v. Rotondi,* 88 A.D.2d 537, 450 N.Y.S.2d 198 (App.Div. 1982).

■ The damage formula is an even more troublesome feature of Section 3(a). The clause would require Cipolla, before he does any work on a former Reimer client, to pay to Reimer one and one half times Reimer's annual fees for the last 12 months in which it serviced the client. While, to be sure, Reimer has an important interest in protecting its client base, this clause is so exceptionally aggressive as to have lost the requisite reasonable relationship to legitimate business interests Reimer is entitled to protect. Any work by Cipolla on a large Reimer client would, by the terms of Section 3(a), require substantial up-front payments to Reimer with no regard to the harm or loss to Reimer, the benefits to Cipolla or, for that

7. For the opposite result, see *Holloway v. Faw, Casson & Co.,* 319 Md. 324, 572 A.2d 510 (1990), where an accounting firm sued a withdrawing partner to enforce his promise not to service clients for five years and to pay the firm 100% of the prior year's fee for any clients of the firm who engage the services of the withdrawing partner during the five year period. The Maryland Court of Appeals found that the agreement

> ties the restriction closely [to the firm's] interest in its client base, inhibits the [withdrawing partner's] practice of accountancy only with respect to that client base, and gives the general public outside of that client base, the benefit of unfettered competition. The reasonableness of the provision is further reinforced by its ready analogy to the purchase of an accounting practice. 572 A.2d at 520.

In *Perry v. Moran,* 109 Wash.2d 691, 748 P.2d 224 (Wash.1987), *modified on reconsideration,* 111 Wash.2d 885, 766 P.2d 1096 (1989), the Washington Supreme Court upheld an accountant's agreement in which an employee who provided services to his former employer's clients within five years was required to pay 50% of the actual fees billed or billable to such client accounts each year for a period of three years from

the date employee first provides service to the clients. The court rejected the suggestion that the agreement should have merely prevented the employee from soliciting or diverting clients:

> A covenant that merely prohibits solicitation or diversion places upon the employer the burden of proving (1) that the former employee performed some act or acts which had the potential of enticing the clients away from the employer, and (2) that those acts were the cause of the client's decision to leave the employer and seek accounting services from the former employee. If this burden were placed on the employer, the process would be difficult and expensive. The employer would be required to invest time and money in litigating the nature of the former employee's actions toward the clients. In many cases the employee would have to bring those clients into the litigation as witnesses to prove that the solicitation occurred.

Although we agree that some difficulties exist regarding proof of a departing employee's role in engaging services of his former employer's clients those difficulties do not justify the broad sweep of Section 3(a). See *Olliver/Pilcher Ins. v. Daniels,* 148 Ariz. 530, 532, 715 P.2d 1218, 1220 (1986).

matter, the interests of the client. If enforced, the clause would transfer to Reimer substantially more income than it recently earned from the particular client. These features mark the agreement as a penalty clause, and penalty clauses are not enforceable. *Jacobs v. Citibank, N.A.*, 61 N.Y.2d 869, 474 N.Y.S.2d 464, 462 N.E.2d 1182 (1984); *Fifty States Mgt. Corp. v. Pioneer Auto Parks, Inc.*, 46 N.Y.2d 573, 415 N.Y.S.2d 800, 389 N.E.2d 113 (1979); *In re West 56th Street Associates*, 181 B.R. 720 (S.D.N.Y.1995).

Reimer argues that the clause is a liquidated damage clause of the type that has been enforced by other jurisdictions. However, none of those liquidated damages clauses cited by Reimer enforces the type of damage formula at issue here. For example, in *Dobbins,* supra, 708 P.2d at 580, the Supreme Court of Montana held that a damages provision which required the employee to pay the firm 100% of the gross fees generated by the firm's former client from the preceding twelve months, payable in monthly installments was not an unreasonable restraint on trade. In *Isler,* 38 Or.App. at 233, 589 P.2d at 1180, the Oregon Court of Appeals found that a fee of fifty percent of the gross fees earned from services rendered in the three years following termination for clients of the employer and ten percent of the gross fees earned from his own clients was reasonable. In *Foti,* 220 Va. at 806, 263 S.E.2d at 433–34, the Supreme Court of Virginia found that a charge to former partners of one third of each year's fee from firm's former clients was not unreasonable. Finally, in *Miller v. Williams,* 300 So.2d 752, 753–54 (Fla.App. 1st 1974), a Florida court enforced a provision which obligated mutually, the employer and the departed employee to pay, over a period of time, one-third of any fees generated over the three years following termination, if he engaged the other's client.

Finally, we note that Section 3(a) contains no geographic limitation. Cipolla is restricted from competition with Reimer in Hong Kong as well as Miami, in Seattle as well as White Plains. It is well settled that, to be enforceable, restrictions on the activities of former employees must be reasonable in terms of geographic application. *Columbia Ribbon & Carbon Mfg.,* 42 N.Y.2d at 499, 398 N.Y.S.2d at 1006, 369 N.E.2d at 6; *Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 558 (E.D.N.Y.1995). No attempt is made in Section 3(a) to impose any geographic limitation. This is an additional indicia of unreasonableness and unenforceability. *Ivy Mar Co.,* 907 F.Supp. at 558–59 (E.D.N.Y. 1995).

Reimer suggests that if the Court finds certain aspects of the agreement unreasonable, it may modify the agreement so as to make it reasonable since both the 1991 Agreement and the 1992 Agreement contain judicial modification clauses. New York law permits courts, under certain circumstances, to rewrite unreasonable contracts into reasonable ones. See *Karpinski v. Ingrasci,* 28 N.Y.2d 45, 51, 320 N.Y.S.2d 1, 6, 268 N.E.2d 751, 754–55 (1971); *Coolidge Co. v. Mokrynski,* 472 F.Supp. 459, 463 (S.D.N.Y.1979); *USAchem Inc. v. Goldstein,* 512 F.2d 163, 168 (2d Cir.1975); *Deloitte & Touche,* supra, 636 N.Y.S.2d at 679.

Here the infirmities of Section 3(a) are simply too patent for this type of restructuring. To bring Section 3 into conformity with the law would require this Court essentially to rewrite the entire section, an exercise not appropriate here. See *Philip G. Johnson & Co. v. Salmen,* 211 Neb. 123, 129, 317 N.W.2d 900, 904 (court declined to modify restrictive covenant where "far too many variables" were unreasonable). For all of these reasons, the Court concludes that Section 3 is unenforceable.

## C. Fiduciary Duty

In Counts (sic) Two, Five[8] and

---

8. Count Five alleges that Cipolla breached his fiduciary duty when he failed to properly record and submit time entries for his services rendered with respect to Plaintiff's clients during the two week period prior to his resignation. He also breached this duty, as stated in Count Two, when

he copied or caused to be copied all or a significant portion of Plaintiff's files concerning the Cohane Rafferty Clients and, thereafter, removed such photocopies from Plaintiff's premises and retained them for his own use in connection with

Six [9] Reimer seeks damages and injunctive relief for Cipolla's alleged breach of fiduciary and contractual duties arising out of his alleged copying of certain Cohane Rafferty files before he left the Reimer firm. In Count Two, Reimer charges that Cipolla violated the confidentiality clause of the contract because he copied client files for his own use. While Cipolla concedes that he copied the files, he argues that these counts should be dismissed because the files did not contain any trade secrets.[10] However, the unauthorized use of client files need not always contain trade secrets. See *Leo Silfen Inc. v. Cream,* 29 N.Y.2d 387, 391–92, 328 N.Y.S.2d 423, 427, 278 N.E.2d 636, 639 (Ct. App.1979) ("If there has been a physical taking or studied copying, the court may in a proper case enjoin a solicitation, not necessarily as a violation of a trade secret, but as an egregious breach of trust and confidence"); *Ecolab v. Paolo,* 753 F.Supp. 1100, 1111 (E.D.N.Y.1991) ("the unauthorized physical taking and exploitation of internal company documents ... by an employee for use in his future business or employment is to be considered unfair competition."); *Giffords Oil Co., Inc. v. Wild,* 106 A.D.2d 610, 611, 483 N.Y.S.2d 104, 106 (2d Dept.1984) ("information such as fuel oil capacity of customer's tanks, and the amount certain customers are willing to pay, which aid the plaintiffs in establishing prices and which could only be achieved through personal solicitation is confidential"); *Velo–Bind, Inc. v. Scheck,* 485 F.Supp. 102, 109 (S.D.N.Y.1979).

■ Moreover, Cipolla argues that he was not in breach because he was acting at the direction of the clients. In support, Reimer has provided an affidavit from Steven Sprague, the Chief Financial Officer of Cohane Rafferty. Apparently, sometime before Sprague knew that Cipolla would be leaving the firm, Sprague asked Cipolla to provide him with a copy of the Cohane Rafferty files. Reimer, however, contends that the files included not only client records, which it concedes belong to client, but also Reimer workpapers, which it argues were the property of the Reimer firm.[11] Because the contents of the files and other facts surrounding Cipolla's conduct have not been fully developed, we believe that Reimer's contract and fiduciary duty claims, raise issues of material fact and thus, we deny summary judgment.

## CONCLUSION

For the reasons set forth above, the Court grants summary judgment as to Counts (sic) One, Three and Four, and denies summary judgment as to Counts (sic) Two, Five and Six.

**SO ORDERED.**

his prospective and actual engagement by the Cohane Rafferty Clients.

9. In Count Six, Plaintiff requests a permanent injunction directing the Defendant to return all "Confidential Information," as defined in the 1991 Agreement and the 1992 Agreement.

10. Cipolla argues that the agreement is vague and thus unenforceable. The fact, however, that the agreement may not be unenforceable does not defeat Reimer's claims for breach of fiduciary duty if Cipolla obtained client information in a wrongful manner. *Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547 (E.D.N.Y.1995) ("Even where an employee has not signed a non-competition agreement, he may be liable to the former employer if he has obtained client information by wrongful means such as theft or intentional memorization");

11. ET Section 501–1 AICPA Professional Standards ("member's workpapers—including, but not limited to, analyses and schedules prepared by the client at the request of the member—are the member's property, not client records and need not be made available"). Moreover, Reimer argues that the manner in which Cipolla transferred the files was unlawful in light of accounting ethical principles which require that accounting firms turn over client records "as soon as a demand is made for them." See ET, Section 501–1.