HAROLD A. GESELL, APPELLEE AND CROSS-APPELLANT, V.
RICHARD E. REEVES, APPELLANT AND CROSS-APPELLEE.
429 N.W.2d 363

Filed September 23, 1988.   No. 86-825.

James M. Kelley for appellant.

Steven D. Burns and Beverly Evans Grenier, of Steven D. Burns, P.C., for appellee.

BOSLAUGH, WHITE, and SHANAHAN, JJ., and SPRAGUE and THOMPSON, D. JJ.

THOMPSON, D.J.

Defendant-appellant, Richard E. Reeves, together with his wife, purchased 320 acres of undeveloped land in Maricopa County, Arizona, in February of 1980 for $200 per acre, or a total of $64,000. Reeves paid $13,000, financed the balance with a loan, and executed a deed of trust to the Bank of California for $51,000, with principal and interest due yearly for 6 years commencing on April 2, 1981.

On February 25, 1980, Reeves entered into a written purchase agreement with plaintiff-appellee, Harold A. Gesell, whereby Reeves agreed to sell to Gesell 60 acres of the land for $30,000, with a payment of $12,500 and the balance of $17,500 to be carried on a land contract with six annual installments plus 11 percent interest.

Sometime after the purchase agreement was signed and prior to May 16, 1980, Reeves advised Gesell that he had a chance to sell the land for approximately $450 per acre. At this price Gesell would take a loss.

On May 17, 1980, the parties entered into another written agreement, incorporating the terms of the February 25, 1980, agreement. Under this agreement Gesell paid an additional $2,500 and obtained a 20-percent ownership interest in the land. In the event of sale of the land, the parties agreed that Reeves would receive his base investment of $66,000 ($2,000 for previously incurred expenses was added by Reeves), plus 80 percent of the profit above this. Gesell would receive 20 percent

of the profit above $66,000, plus Reeves would pay Gesell $15,000 and any reduction in principal made on a promissory note to be executed by Gesell for $17,500 payable in six yearly installments at 11 percent interest commencing February 25, 1981, and each year thereafter through 1986. Gesell also agreed to pay 20 percent of all taxes, insurance, and other expenses as agreed attributed to the maintenance, upkeep, and future development of the property.

Two weeks later, Reeves and Gesell flew to Phoenix, Arizona, to conduct negotiations with a prospective purchaser, Betty Boo, Inc. Betty Boo was represented by Hugh Johnson, president of Betty Boo. A purchase agreement was reached and a written purchase agreement executed in June of 1980. The agreement called for a purchase price of $144,000 on the following terms: (1) $1,000 in cash payable on the execution of the agreement; (2) $1,000 due on or before July 10, 1980; (3) $19,600 at time of closing; (4) $51,000 by purchaser paying Reeves' note with the Bank of California; and (5) Two promissory notes, each for $35,700, with 10 percent interest payable on a 10-year amortization schedule.

The agreement was signed by Betty Boo, Reeves, and his wife. Reeves and his wife, on June 25, 1980, executed two deeds covering the land under the terms of the agreement, which were placed in escrow.

Gesell executed a quitclaim deed to Betty Boo.

Betty Boo actually paid Reeves $6,000 prior to closing and $17,699.01 on January 2, 1981. Reeves' closing costs were $898.72.

Betty Boo's first annual payment on the two notes, including principal of $10,001.20 and interest of $1,619.16, or a total of $11,620.36, was due on March 22, 1981. Betty Boo was given credit for interest paid at closing of $2,809.15, with a balance due of $8,811.21. This payment was made by Betty Boo in 1981. Betty Boo also remitted Reeves' 1981 payment to the Bank of California in the amount of $14,100.

In September 1982, Johnson gave Reeves $5,000 as consideration for an extension for Betty Boo's already overdue payment. Betty Boo later defaulted and deeded the land back to Reeves. Thereafter, Johnson and Reeves entered negotiations,

this time with Johnson representing Southwest Jojoba Company. On October 1, 1982, Jojoba gave Reeves $5,000 earnest money. An agreement was reached on the property for a purchase price of $176,000, and a closing took. place on November 19, 1982. Reeves' closing costs were $9,254.77. Payment was made by Jojoba's paying $39,000 in cash at closing, and executing a note and deed of trust for $132,000. By September of 1983, Jojoba had paid all that was due on the note, as admitted by Reeves at trial. Jojoba paid $110,500 to an escrow agent, and the escrow agent paid the balance due to the Bank of California of $36,409 and remitted a check to Reeves of $74,091. The difference between $132,000 and $110,500 is $21,500. Reeves, by his admission of receiving all the amounts due, would also have received the $21,500 between the November 19, 1982, closing and September of 1983.

Gesell filed his petition in the district court on December 21, 1984, praying for "an accounting, judgment in an uncertain amount but in excess of $34,702.00, together with interest as allowed by law and costs . . . ." Reeves filed an answer admitting portions of the petition and denying portions.

Reeves filed a counterclaim alleging a breach of the contract by Gesell with Reeves, and alleging the following:

9. As the direct, sole and proximate result of plaintiff's failure and refusal to live up to the burdens imposed upon him by the Agreement, defendant was forced to find a buyer for the property under a distress situation and he was able to negotiate a contract with Betty Boo, Inc., an Arizona corporation, for the purchase of the property at approximately One Hundred Forty-Four Thousand ($144,000.00) Dollars. With the concurrence of the Bank of California the Betty Boo, Inc.,— defendant transaction was approved and foreclosure proceedings against defendant's interest in the property were dropped;

. . . .

13. As the direct, sole and proximate result of plaintiff's failure and refusal to abide the terms of his agreement with defendant, and his consequent breach thereof, defendant was unable to continue to finance the property to the Bank of California nor was he able to maintain

taxes, insurance, and other expenses directly attributable to said property. Consequently, a second foreclosure was instituted by the Bank of California against defendant's interest in the property. With the concurrence of the Bank of California, defendant negotiated a sale of the property in November of 1982 to the Southwest Jojoba Company, an Arizona corporation, for the sum of One Hundred Ten Thousand Five Hundred ($110,500.00) Dollars. From said proceeds defendant paid the Bank of California Thirty-six Thousand Four Hundred Nine ($36,409.00) Dollars and paid taxes, insurance, and other expenses attributable to defendant's and plaintiff's interests in the property. Plaintiff failed and refused to make any contribution to the expenses related to the property in direct breach of his agreement with defendant.

Cross-petitioner prayed for an accounting and judgment of $113,500, plus 20 percent of expenses.

Jury trial was waived, and the matter was tried before the court. The evidence consisted of the testimony of the two parties and exhibits that were received.

The trial court made the following findings:

4. During a trip to the State of Arizona by plaintiff and defendant during which they traveled together, plaintiff stated to defendant that plaintiff wanted nothing further to do with the land transaction and that plaintiff would not sign a promissory note as required by Exhibit No. 4.

5. Plaintiff contends that plaintiff's obligation to pay $17,500.00 by a promissory note to the defendant was discharged upon the sale of the property to Betty Boo, Inc., in December, 1980. The Court does not agree with plaintiff's contention. It appears to the Court that defendant had the right under the agreement, Exhibit No. 4, to insist that plaintiff make the full investment of $32,500.00 as set forth in the terms of Exhibit No. 4.

6. Plaintiff's failure to perform under the terms of Exhibit No. 4 and plaintiff's communication to defendant in June, 1980, prior to the sale of the subject property to Betty Boo, Inc., that plaintiff would not contribute further cash constituted a repudiation of said agreement

by the plaintiff. Plaintiff is entitled only to a return of his original investment in the sum of $15,000.00 plus prejudgment interest on said sum at the rate of 12 percent from and after January 1, 1981, to the date of this judgment. Plaintiff is entitled to judgment in the sum of $15,000.00 plus prejudgment interest in the sum of $9,926.84 for a total judgment in the sum of $24,926.84.

7. Defendant has failed to sustain his burden of proving the allegations contained in defendant's counterclaim and plaintiff is entitled to judgment on defendant's counterclaim.

The court entered judgment in favor of Gesell for $15,000, plus prejudgment interest from January 1, 1981, to date of judgment entry of $9,926.84, for a total of $24,926.84, and dismissed Reeves' counterclaim, with costs taxed to Reeves.

Reeves appealed, and Gesell cross-appealed.

An action for an accounting may under one set of circumstances find its remedy in an action at law and under another find it within the jurisdiction of equity. *Schmidt v. Henderson*, 148 Neb. 343, 27 N.W.2d 396 (1947).

Where the intimate relationships of the parties are involved, an adequate remedy is available only within the equitable jurisdiction of the court. *Philip G. Johnson & Co. v. Salmen*, 211 Neb. 123, 317 N.W.2d 900 (1982).

In an action in equity, this court must review the record de novo and reach an independent conclusion without being influenced by the findings of the trial court; however, where credible evidence is in conflict, we may give weight to the fact that the trial court saw the witnesses and observed their demeanor while testifying. *J. J. Schaefer Livestock Hauling v. Gretna St. Bank, ante* p. 580, 428 N.W.2d 185 (1988); *Allen v. AT&T Technologies*, 228 Neb. 503, 423 N.W.2d 424 (1988); *Philip G. Johnson & Co. v. Salmen, supra.*

We find that the trial court erred in finding that Gesell repudiated the contract. The testimony of Reeves and Gesell was in direct conflict as to whether Gesell repudiated the contract during the trip to Arizona in June of 1980. However, documents received into evidence clearly support the testimony of Gesell. In a letter from Reeves to Gesell dated February 5,

1981, Reeves wrote:

> As I previously explained to you, you and I mutually agreed to sell the land under the terms of the escrow agreement, that agreement included the following:
>
> a. The Buyer would agree to make my mortgage payments and pay the interest on the balance in accordance with my original purchase agreement of the property. The sale to Hugh does not relieve me of my obligation to pay the $51,000.00 note I signed with the Bank of California, it merely says Hugh Johnson agrees to make the payments for me, however, in the event Hugh Johnson fails to make those payments, that does not relieve me of my obligation to make the payments, in such an event I would take whatever legal means necessary to recover clear and full title to the property.
>
> b. Nor does it relieve you of your obligation to pay me the $17,500.00 plus interest you agreed to pay me. As long as Hugh makes his payments, the only thing I will hold you responsible for is the difference in the interest rate.
>
> I hope this illustrates my position to you concerning the agreement. I am more than willing to pay you your 20% of the profit less expenses, however, I will have to pay you on the same basis I get paid.

In a letter from Gesell's attorney dated March 17, 1981, to Reeves, the attorney demanded $29,722.98 from Reeves.

In Reeves' response to the attorney by letter dated April 3, 1981, he wrote:

> I am not disputing the fact that I did make an agreement with Mr. Gesell on the dates indicated in your letter. I will also owe Mr. Gesell an amount very close to the amount you indicated, in fact, if the land escrow closes at maturity, the amount Mr. Gesell would receive would be slightly more than the amount you indicated.

Reeves further indicated in the letter:

> I have agreed to pay Mr. Gesell his 20% of the profits after deducting the expenses on an annual basis as I am paid in accordance with the terms of the escrow agreement. I would also not require Mr. Gesell to pay the balance of the $17,500.00 note at 11% interest that he

agreed to pay me as long as Mr. Johnson continues to make his annual escrow payments.

It is highly unlikely that Reeves would acknowledge the validity of the contract some 10 months after the alleged repudiation of Gesell, if indeed the repudiation had actually occurred. Hence, we find that Gesell did not repudiate the contract.

This court has held that a party to a contract may waive the provisions made for his benefit. *Carter v. Root*, 84 Neb. 723, 121 N.W. 952 (1909). The February 5 and April 3 letters constitute a waiver by Reeves of Gesell's annual payments due under the contract as long as Betty Boo made its payments. The facts show that Johnson, on behalf of Betty Boo, made the payments on the notes and the payment due the Bank of California in 1981.

There is no evidence that Reeves demanded further payment in 1982. Gesell testified:

Q. Were you ever informed by Mr. Reeves that Betty Boo had failed to make the payments?

A. In about the fall of '82. Mr. Reeves — we were in conversation. I kept calling him every so often to try to find out how the property is going and payments and he mentioned that it's possible that Hugh Johnson may default on that and then he may have to take it over.

Q. This is fall of '82?

A. That's the fall of '82 and I asked him at that time if he had the money to make the payments because I was concerned about it being sold out from under us. So, I then would get nothing and at that time he stated that he did have another source of funds and that it was taken care of.

Q. Did you offer to give him money at that point?

A. Yes.

Q. And he said he did not need it, is that correct?

A. That is correct.

It appears from the record that by the fall of 1982, especially after the purchase agreement was made between Reeves and Jojoba, Reeves was primarily interested in avoiding Gesell and their contract.

A summary of the money paid to Reeves or on Reeves' behalf follows:

Received by Reeves:
  From Betty Boo:

| | |
|---|---:|
| Received through closing | $ 23,699.01 |
| March 1981 payment | 8,811.21 |
| 1981 payment to Bank of California | 14,100.00 |
| For extension | 5,000.00 |

  From Jojoba:

| | |
|---|---:|
| Earnest money | $ 5,000.00 |
| Cash at closing | 39,000.00 |
| Payment after closing | 21,500.00 |
| Final payment 1983 | 110,500.00 |
| Total | $227,610.22 |

The following are the sellers' sales expenses:

| | |
|---|---:|
| Betty Boo sale | $ 898.72 |
| Jojoba sale | 9,254.77 |
| Total | $ 10,153.49 |
| Gesell's 20 percent of expenses = | $ 2,030.70 |

The interest due from Gesell to Reeves pursuant to their agreement is as follows:

| | |
|---|---:|
| 1981: Waived by Reeves | |
| 1982: $17,500 × 11 percent = | $ 1,925.00 |
| 1983: 267 days (Feb. 25 to Nov. 19, 1982) × $5.27 per day ($1,925 ÷ 365) = | 1,407.09 |
| Total | $ 3,332.09 |

Pursuant to the parties' agreement, the amount due Gesell is computed as follows:

| | | |
|---|---:|---:|
| Total sales proceeds | | $227,610.22 |
| Less Reeves' base investment | | 66,000.00 |
| Total profit | | $161,610.22 |
| 20 percent of $161,610.22 = | | 32,322.04 |
| Plus Gesell's equity | | 15,000.00 |
| Subtotal amount due | | $ 47,322.04 |
| Less 20 percent expenses | $2,030.70 | |
| Less interest | 3,332.09 | |
| | 5,362.79 | 5,362.79 |
| Total amount due to Gesell | | $ 41,959.25 |

Prejudgment interest is allowable only when the amount claimed is liquidated. Where a reasonable controversy exists as to the plaintiff's right to recover or as to the amount of recovery, the claim is generally considered to be unliquidated, and prejudgment interest is not allowed. *Lutheran Medical Center v. City of Omaha, ante* p. 802, 429 N.W.2d 347 (1988); *Otto Farms v. First Nat. Bank of York*, 228 Neb. 287, 422 N.W.2d 331 (1988); *Philip G. Johnson & Co. v. Salmen,* 211 Neb. 123, 317 N.W.2d 900 (1982).

We determine that there is due from Reeves to Gesell the sum of $41,959.25 and that the district court's judgment is modified accordingly. Costs are hereby taxed to Reeves.

AFFIRMED AS MODIFIED.