**EMPIRE GAS CORPORATION, a Delaware Corporation,
Plaintiff/Respondent/Cross–Appellant,**

v.

**UPG, INC., a Delaware Corporation,
Defendant/Appellant/Cross–Respondent.**

**Nos. 16096, 16098.**

Missouri Court of Appeals,
Southern District,
Division Two.

Oct. 27, 1989.

Motion for Rehearing or to Transfer
Denied Nov. 20, 1989.

Application to Transfer Denied
Jan. 10, 1990.

William H. McDonald, Virginia L. Fry, Celeste K. Johns, Woolsey, Fisher, Whiteaker & McDonald, Springfield, for defendant/appellant/cross-respondent.

Steven G. Emerson, Thomas H. Davis, Morris & Larson, P.C., Kansas City, Darrell Deputy, Jr., Lebanon, for plaintiff/respondent/cross-appellant.

FLANIGAN, Presiding Judge.

On March 16, 1984, plaintiff Empire Gas Corporation, a Delaware corporation ("Empire"), brought an action for breach of contract against defendant UPG, Inc., a Delaware corporation ("UPG"). The action involved six contracts, signed in September 1981, dealing with the sale of propane gas by UPG, a major wholesaler of propane, to Empire, a major retailer of propane. Three days later UPG brought an action against Empire, based on alleged unpaid invoices for propane sold by UPG to Empire under the six contracts.

The six contracts were, as Empire's brief states, substantially identical. The reason for six contracts instead of a single contract was that the propane was to be delivered at six supply points, each having its own "yearly volume" of propane. The total yearly volume for the six delivery points was 105,080,000 gallons, which is the same as 2,627,000 barrels. At times this opinion will refer to the six contracts as the "propane sales agreement," because all six contain the controlling language.

In November, 1984, the two actions were consolidated "for all purposes," with all subsequent pleadings to be filed in the first action. This opinion will treat the actions as a single one, with Empire as plaintiff and UPG as defendant. The instructions so labeled the parties. The claim of UPG will be referred to as the counterclaim.

In September 1988 the case was tried to a jury. At the conclusion of Empire's evidence, the court directed the jury to return a verdict in the amount of $4,104,082.52 in favor of UPG and against Empire on the counterclaim. In addition to the jury's award on the counterclaim, the court later awarded UPG $2,360,641.79 as prejudgment interest, for a total award on the

counterclaim of $6,464,724.31. After deliberation, the jury returned a verdict on the petition in favor of Empire and against UPG in the amount of $4,250,000. Both sides appeal. This court consolidated the appeals and will dispose of both in this opinion.

One paramount issue, hotly contested in the trial court and in this court, is determinative of the two appeals. The resolution of that issue makes it unnecessary to consider many of the subsidiary issues raised by the parties. The issue is this: Was Empire entitled to a *constant* 2–cent per gallon discount during the five-year term of the propane sales agreement, as Empire claims, or was the 2–cent discount subject to being revised by UPG during the five-year period, as UPG claims? For the reasons which follow, this court sustains UPG's position on the issue.

The propane sales agreement is dated September 14, 1981. Actually it was signed for Empire by Earl Noe on September 11, 1981, and signed by UPG's president on September 14, 1981. The propane sales agreement identified its "primary term" as commencing July 1, 1981, and continuing to June 30, 1986, and year to year thereafter unless cancelled or unless sooner terminated "as hereinafter provided." Paragraph 15 of the propane sales agreement dealt with termination for breach of either party.

Sales commenced in June or July 1981, several months prior to the signing of the propane sales agreement. From the commencement of the sales through May 1982, UPG gave Empire a 2–cent per gallon discount from its "posted price," that is, the price which Empire's brief describes as UPG's "normal wholesale price" or "established price."

On June 1, 1982, UPG reduced the discount from 2 cents per gallon to ½ cent per gallon. UPG gave Empire notice of the reduction before making it. Empire, having previously paid all invoices when due, continued to claim the 2–cent discount and made payments on that basis until August 1982. UPG then notified Empire it would make no further deliveries unless Empire

paid the previously withheld amount, that is, the amount reflected by the difference between the two discounts. Empire paid the previously withheld amount.

Beginning in September 1982, Empire paid in full invoices calculated on the basis of the ½–cent discount, but placed a restrictive endorsement on the back of the payment checks protesting the amount paid.

In June 1983 Empire underwent a "leveraged buyout" which, so UPG claimed, adversely affected Empire's credit standing. In November 1983 UPG demanded certain credit arrangements from Empire, but Empire did not accede. In November 1983 UPG ceased delivering propane by pipeline to Empire, although the parties continued to deal with each other with respect to two of the contracts which involved Empire's "Texas truck operations." In November 1983, 13 invoices representing propane delivered to Empire under the propane sales agreement were unpaid. The lawsuits ensued.

## APPEAL OF UPG—No. 16098

UPG's fundamental contention is that the propane sales agreement, and principally paragraph 5 thereof dealing with "PRICE," gave UPG the right to revise the 2–cent discount, and that Empire's evidence, primarily a letter dated July 21, 1981, from UPG's Richard Thomason to Empire's Earl Noe, was improperly received because its admission violated the parol evidence rule as set forth in § 2–202 of the Uniform Commercial Code. UPG also argues that the trial court erred in giving Instruction 6, Empire's verdict-directing instruction, because no jury issue was created and thus Instruction 6 was not supported by the evidence. This court agrees with UPG. This court holds that the trial court's rulings, to the extent they differ from the contents of this opinion, constituted misapplications of the law.

Empire's representatives during the material events included Bill Byrne and Earl Noe.

UPG's representatives during the material events included Rex Donaldson, Roger Helgoe and Dick Thomason.

In May 1981, representatives of Empire and UPG held a conference at UPG's headquarters in Omaha, Nebraska. Those discussions culminated in the signing of the propane sales agreement in September 1981, although the parties had commenced their dealings earlier.

During the discussions preceding the signing of the six contracts, according to Empire's evidence, the parties discussed potential sales volumes. Empire was told by UPG that a discount of 2 cents per gallon would be given if Empire purchased at least 1,750,000 barrels per year. A barrel is 40 gallons. For purposes of discount, UPG had established five customer categories. Customers buying 1,750,000 barrels or more per year were entitled to a 2-cent discount. Customers buying less than 500,000 barrels per year received no discount. Customers in the three intermediate categories received discounts of ½ cent, 1 cent, or 1½ cents, depending upon volume.

A few days following May 1981, UPG sent Empire a blank form contract to be used as a basis for discussion. Conversations took place between their respective representatives regarding proposed changes. Mr. Noe, of Empire, objected to the fact that the form sent by Mr. Thomason, of UPG, made no specific reference to the 2-cent discount, although it did refer to Empire being charged the price applicable to its particular class of customer based on volume. According to the testimony of Noe, Thomason said that the legal department of UPG required the discount arrangement to be "in a separate document."

On July 21, 1981, Thomason of UPG sent Noe of Empire a letter ("the Thomason letter") referring to the six contracts later signed. The letter reads:

"Under terms of the captioned Agreements, UPG agrees to sell and Empire agrees to purchase one hundred five million eighty thousand (105,080,000) gallons of propane at various F.O.B. points. The price of propane under the Agreements is based upon UPG's established price for the customer category of which Buyer is a member.

The customer category of which Empire is a member, based upon the volume designated in the contracts, gives them a two cent (2.0c) per gallon discount from UPG's established price at the specified F.O.B. point.

The established customer category is based upon the volume of propane purchased under the contracts; therefore if the volume should increase or decrease the customer category is subject to change.

If you have any questions concerning the foregoing, please call us."

Copies of the foregoing letter were sent to UPG's representatives Donaldson and Helgoe, and to Empire's Byrne.

On July 24, 1981, UPG sent Empire two copies of each of the six contracts and asked that they be executed by an officer of Empire and returned to UPG for execution by UPG's management.

In August 1981 Bill Byrne of Empire asked Rex Donaldson of UPG to have an officer of UPG sign a letter similar to Thomason's letter of July 21, 1981. Thomason was not an officer.[1]

1. On August 21, 1981, according to UPG's evidence, Roger Helgoe of UPG wrote a letter to Bill Byrne reading as follows:

"As a follow-up to your conversation with Rex, this letter is to serve as notification that, under our current volume discount policy, Empire is due a 2 cent per gallon discount based on the volumes specified by our propane agreements.

*It is important to note that from time to time our discount schedule may change, but I assure you that all customers will be treated equitably within their respective classifica-* tions. A copy of our current discount schedule is enclosed for your review. The established customer category is based on the volume of propane purchased under the contracts; therefore, if the volume should change, the category would change accordingly. We would, of course, appreciate your treating the discount memo as confidential.

Bill, let me say once more that we appreciate Empire's business, and look forward to a long relationship with your company." (Emphasis added.)

For each delivery point, Empire agreed to purchase during each calendar year a minimum of 75 percent of the yearly volume for that year, to be delivered in accordance with a specified schedule. With restrictions and on named conditions Empire had an option to increase its monthly or yearly volume.

One of the delivery points was Mont Belvieu, Texas. All six contracts, except for the designation of the delivery point and its yearly volume, contained provisions identical to the following portions of the contract pertaining to Mont Belvieu.

"5. PRICE

The price per gallon, F.O.B., *Mont Belvieu, Texas* (or such other point or points as Seller may elect) for propane sold hereunder shall be (a) Seller's established price in effect at the time of delivery for the customer category of which Buyer is a member (which price may be revised from time to time during the period this Agreement is in full force and effect), plus (b) transportation costs to the place of delivery specified in Paragraph 4 above. Any revisions in price during the term of this Agreement shall be communicated to Buyer.

6. BILLING AND PAYMENT

Seller shall invoice Buyer upon delivery as specified in Article 4 above for all product sold hereunder by Seller to Buyer during the period covered by the invoice. Buyer shall make full payment of the amount(s) specified on each invoice within fifteen (15) days from the date of the invoice.

If Buyer disagrees with the amount of any invoice for any reason, Buyer shall immediately notify Seller of such disagreement so that the difference may be resolved before the due date for payment of the invoice. If Buyer fails to give such notification, or if Buyer and Seller do not resolve such disagreement before due date, such invoice shall be adjusted by the Buyer and payment made according to the terms of the invoice on the due

At the trial, testifying for Empire, Bill Byrne testified that he did not recall receiving the letter of August 21, 1981, and that he would not have allowed Empire to sign the contracts if he

date, with payment of the additional amount due, if any, subject to final resolution of the disagreement.

Buyer and Seller agree that not withstanding anything in this agreement to the contrary, Buyer's continual compliance with Seller's credit policy and requirements (whether the same shall be the establishment of a credit limit, or a letter of credit, or prepayment) shall be a condition precedent to Seller's obligation to deliver product under this Agreement.

. . . . .

11. RULES AND REGULATION

This Agreement shall be governed by the Uniform Commercial Code of the State of Nebraska."

In its petition Empire claimed that UPG breached the propane sales agreement by failing to establish UPG's "posted price in good faith," by failing "to allow Empire the agreed two-cent per gallon discount on propane," by wrongfully refusing to make further deliveries of propane, in November 1983, unless Empire complied with UPG's credit demands and by failing "to extend Empire the benefit of lower net prices charged to other customers of [UPG] 'in customer categories' no more favorable than Empire's, for propane sold at the same FOB points at approximately the same times."

At the trial Empire did not offer any evidence that UPG's reduction of the discount from 2 cents to ½ cent was not also made with respect to other customers in Empire's customer category. The only verdict-directing instruction given by Empire in support of its petition was Instruction 6 which reads as follows:

"INSTRUCTION 6

Your verdict must be for plaintiff Empire Gas Corporation against defendant UPG, Inc. if you believe:

knew that UPG had a right to change the discount. The receipt or nonreceipt of this letter is not a factor in this opinion.

First, plaintiff Empire Gas Corporation and defendant UPG, Inc. entered into six agreements whereby plaintiff Empire Gas Corporation agreed to purchase the volumes of propane set forth in those contracts and defendant UPG, Inc. agreed to sell that propane to the plaintiff Empire Gas Corporation at defendant UPG, Inc.'s posted price less a two cent per gallon discount, and

Second, plaintiff Empire Gas Corporation performed plaintiff's agreement, and

Third, defendant UPG, Inc. failed to perform defendant's agreement, and

Fourth plaintiff Empire Gas Corporation was thereby damaged."

■ The parties agree that the propane sales agreement is governed by the Uniform Commercial Code of the state of Nebraska as provided in paragraph 11 of the agreement. Section 2–202 of the Uniform Commercial Code, which is in effect in Nebraska (Laws of Nebraska 1963, c. 544, Art. II, § 2–202, p. 1712) reads:

"§ 2–202. Final Written Expression: Parol or Extrinsic Evidence.

*Terms* with respect to which the confirmatory memoranda of the parties agree or *which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement* or of a contemporaneous oral agreement but may be *explained* or *supplemented*

(a) by course of dealing or usage of trade (Section 1–205) or by course of performance (Section 2–208); and

(b) by evidence of *consistent* additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement." (Emphasis added.)

As will be seen, Empire's position depends on the admissibility and construction of the Thomason letter. This position hinges upon § 2–202 of the Uniform Commercial Code and authorities construing it. Although the Supreme Court of Nebraska has mentioned § 2–202, *Timmerman v. Hertz*, 195 Neb. 237, 238 N.W.2d 220, 225 (1976), that case sheds no light on the issue here. In a bankruptcy case based on Nebraska law, *In re Cook*, 52 B.R. 558, 561 (Bkrtcy, D.N.D.1985), the court, citing "UCC § 2–202, RRS Neb," said, "If the parole (sic) evidence offered is inconsistent with or contradictory to the written contract, then it cannot be admitted." [2]

A leading text authority on the Uniform Commercial Code has said:

"The heart of the parol evidence rule is found in Section 2–202 prior to Sections 2–202(a) and 2–202(b). With respect to common terms in confirmatory memoranda or *terms in a writing that was intended to be complete concerning those terms, no evidence of contradictory prior written or oral or contemporaneous oral agreements is admissible.* In Sections 2–202(a) and 2–202(b) two kinds of evidence that *are* admissible are then added. Under Section 2–202(a), evidence of a course of dealing, usage of trade, or course of performance is admissible to explain or supplement the written terms. Evidence of *consistent* additional terms is also admissible to explain or supplement the written terms under Section 2–202(b), except where the writing was intended to be complete as to all the terms of the parties' agreement." R. Hillman, J. McDonnell, S. Nickles, Common Law and Equity Under the Uniform Commercial Code, (1985), Par. 3.05[1]. (Emphasis added.)

The following authorities support the proposition that if, as this court holds, paragraph 5 of the propane sales agreement was intended by the parties as a final expression of their agreement with respect to price, including discount and the power to revise the discount, paragraph 5 may not be contradicted by the Thomason letter.

**2.** In *Five Points Bank v. White,* 231 Neb. 568, 437 N.W.2d 460, 462 (1989), the court made no mention of the Uniform Commercial Code but did say: "The parol evidence rule renders ineffective proof of a prior or contemporaneous oral agreement which alters, varies, or contradicts the terms of a written agreement." The alleged prior agreement in that case was oral.

§ 2–202 U.C.C.; *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 362 (3d Cir.1987); *Binks Mfg. Co. v. Nat. Presto Industries, Inc.*, 709 F.2d 1109, 1115[2] (7th Cir.1983); *C.F. Braun & Co. v. Oklahoma Gas & Elec. Co.*, 603 F.2d 132, 133–134 (10th Cir. 1979); *Bunge Corporation v. Recker*, 519 F.2d 449, 451[2] (8th Cir.1975); *Southern Concrete Serv. v. Mableton Contractors*, 407 F.Supp. 581, 585 (N.D.Ga.1975); *Alaska Northern Dev. v. Alyeska Pipeline Serv.*, 666 P.2d 33, 37[1] (Alaska 1983); *Shore Line Properties, Inc. v. Deer-O-Paints & Chem. Ltd.*, 24 Ariz.App. 331, 538 P.2d 760, 763[2] (1975); *Green Chev. Co. v. Kemp*, 241 Ark. 62, 406 S.W.2d 142, 143 (1966); *C.H. Robinson Co., v. L & M Brokerage Co.*, 344 So.2d 894, 895[1] (Fla. App.1977); *Hill Aircraft & Leasing Corp., v. Planes, Inc.*, 158 Ga.App. 151, 279 S.E.2d 250, 252 (1981); *Milwaukee Valve Co. v. Mishawaka Brass Mfg.*, 107 Wis.2d 164, 319 N.W.2d 885, 888[2] (Wisc.App.1982); 17 A.L.R.3d 1010, 1076 (§ 11). See, generally, Parol Evidence and the U.C.C., Wallach, 44 Mo.L.Rev. 651 (1979).

In *Alaska Northern Dev. v. Alyeska Pipeline Serv., supra,* the court, discussing U.C.C., § 2–202, said:

"In order to exclude parol evidence concerning the inclusion of additional terms to a writing, *a court* must make the following determinations. First, *the court* must determine whether the writing under scrutiny was integrated, i.e., intended by the parties as a final expression of their agreement with respect to some or all of the terms included in the writing. Second, *the court* must determine whether evidence of a prior or contemporaneous agreement contradicts or is inconsistent with the integrated portion. *If the evidence is contradictory or inconsistent, it is inadmissible.* If it is consistent, it may nevertheless be excluded if the court concludes that the consistent term would necessarily have been included in the writing by the parties if they had intended it to be part of their agreement.

. . . . .

An integrated writing exists where the parties intend that the writing be a final expression of one or more terms of their agreement. *Kupka v. Morey*, 541 P.2d 740, 747 n. 8 (Alaska 1975); Restatement (Second) of Contracts § 209(a) (1979)." (Emphasis added.)

 The instant proceeding is not a mismatch of the Russia versus Finland variety. It is a controversy between two large corporations. This court agrees with the following language contained in *Binks Mfg. Co. v. Nat. Presto Industries, Inc., supra,* 709 F.2d at 1116:

"Furthermore, the district court's decision to preclude Presto from introducing extrinsic evidence regarding the maximum capacity issue pays credence to the policy underlying the parol evidence rule as set forth in UCC section 2–202. This court in *Luria Bros. [v. Pielet Brothers Scrap Iron ]*, 600 F.2d [103] at 110 n. 5, stated:

'The parol evidence rule ... is a rule of substantive law. Evidence is excluded not because it is not credible or not relevant but because of a policy favoring the reliability of written representations of terms of a contract.'

This policy of upholding the integrity of written contracts and favoring written terms over extrinsic evidence is particularly relevant in cases of this nature involving a written contract between two large corporations presumably represented by competent counsel. Such parties should be held to the terms of their written contract whenever it is reasonable to do so, as it is incumbent upon courts to uphold the dignity of a contract whenever possible by preventing parol evidence from being used to negate the terms of written contracts. The First Circuit's words in *Intern. Business Machines v. Catamore Enterprises*, 548 F.2d 1065, 1073 (1st Cir.1976), cert. denied, 431 U.S. 960, 97 S.Ct. 2687, 53 L.Ed.2d 278 (1977) are particularly apt in this case.

'The morass of business dealings between two companies described on this record, their promises oral and written, the disparity of their understandings, the

frustration of expectations, the inevitable recriminations and conflicting memories—all this is not unique, new, or infrequently encountered. The law in its effort to facilitate just resolutions of such controversies has, over the centuries, developed certain aids or guides to decision.... The first is the substantive principle that when, in the course of business transactions between people or corporations, free and uncoerced understandings purporting to be comprehensive are solemnized by documents which both parties sign and concede to be their agreement, such documents are not easily bypassed or given restrictive interpretations.' "

Empire's brief states:

"The business relationship between Empire and UPG proceeded smoothly during the first year of the five-year contract term. From July of 1981 through May of 1982, Empire purchased substantial quantities of propane from UPG, usually in separate deliveries of a million to two million gallons at a time. All of the invoices which Empire received from UPG for these purchases were computed on the basis of UPG's posted price, less two cents per gallon. Empire purchased the quantities of propane it was obligated to take under the contract, UPG sent its invoices at their established price less two cents, and Empire timely paid the discounted invoices tendered by UPG."

At the trial Empire's principal witness with respect to its damages was Albert Armstrong, a certified public accountant. Armstrong divided Empire's claimed damages into three categories. Empire's brief states:

"The first category of damages sustained by Empire pertains to the propane purchased from UPG after UPG reduced its discount from two cents to one-half cent per gallon. To perform this computation, Mr. Armstrong totalled up the gallons Empire had purchased under all six contracts after the discount was reduced, then multiplied the total gallons by a cent and a half, the overcharge by

UPG after it reduced the discount. The resulting overpayments contained in Empire's first category of damages total $2,146,056.00."

In support of that statement Empire's brief directs this court's attention to a page of the transcript and also to Empire's Exhibit 224. A portion of Exhibit 224 is Exhibit N which contains a list of UPG's "weekly average posted price" for weeks beginning July 1, 1981, and continuing, on a weekly basis, through November 1983, when UPG ceased delivering propane by pipeline to Empire.

As Empire's exhibit shows, UPG's posted price varied from month to month and from week to week. Indeed, it often fluctuated daily. Empire used the "weighted average" for a given week to show the average posted price for that week. The following are excerpts from Exhibit N:

| Week Ended | UPG Weekly Average Posted Price (in cents per gallon) |
|---|---|
| 06–Jul–81 | 48.00 |
| 03–Aug–81 | 48.00 |
| 08–Sep–81 | 47.50 |
| 26–Oct–81 | 47.50 |
| 07–Dec–81 | 45.50 |
| 04–Jan–82 | 44.64 |
| 08–Feb–82 | 34.00 |
| 12–Apr–82 | 35.00 |
| 24–May–82 | 42.00 |

On June 1, 1982, UPG revised its discount for Empire's customer category from 2 cents to ½ cent. Figures from Exhibit N show UPG's weekly average posted price following that change, including the following:

| | |
|---|---|
| 07–Jun–82 | 38.00 |
| 02–Aug–82 | 44.14 |
| 20–Sep–82 | 50.50 |
| 08–Nov–82 | 54.50 |
| 03–Jan–83 | 44.00 |

Although paragraph 5(b) of the propane sales agreement makes transportation costs an additional element of the price per gallon, the parties have not disagreed about transportation costs and they need not be considered.

The foregoing excerpts from Exhibit N, coupled with the June 1, 1982, revision of the discount from 2 cents to ½ cent, presents the following history of prices expressed in cents per gallon (ignoring the undisputed transportation costs):

| Week Ended | Column A (UPG Weekly Average Posted Price) | Column B (Price actually billed to Empire) | Column C (Price Empire Claims should have been billed to Empire) |
|---|---|---|---|
| 06–Jul–81 | 48.00 | 46.00 | 46.00 |
| 03–Aug–81 | 48.00 | 46.00 | 46.00 |
| 08–Sep–81 | 47.50 | 45.50 | 45.50 |
| 26–Oct–81 | 47.50 | 45.50 | 45.50 |
| 07–Dec–81 | 45.50 | 43.50 | 43.50 |
| 04–Jan–82 | 44.64 | 42.64 | 42.64 |
| 08–Feb–82 | 34.00 | 32.00 | 32.00 |
| 12–Apr–82 | 35.00 | 33.00 | 33.00 |
| 24–May–82 | 42.00 | 40.00 | 40.00 |
| 07–Jun–82 | 38.00 | 37.50 | 36.00 |
| 02–Aug–82 | 44.14 | 43.64 | 42.14 |
| 20–Sep–82 | 50.50 | 50.00 | 48.50 |
| 08–Nov–82 | 54.50 | 54.00 | 52.50 |
| 03–Jan–83 | 44.00 | 43.50 | 42.00 |

From statements appearing in Empire's brief and quoted below [3] this court construes Empire's position to be: The Thomason letter governed the discount intended by the parties, and the propane sales agreement did not; the letter and the propane sales agreement were contemporaneous documents; the propane sales agreement was not integrated with respect to the 2–cent discount; the 2–cent discount from the established or posted price was intended to be constant; the conduct of UPG upon which Empire's claim for damages was based, and upon which the damages could

---

**3.** The argument portion of Empire's brief makes the following statements:

"[T]he July 21, 1981 letter from Mr. Thomason to Mr. Noe was intended by the parties as the written expression of the parties' agreement concerning the discount to be allowed Empire.... [T]he discount term was intended by the parties to be governed by the July 21, 1981 Thomason letter, not by the general language of the Propane Sales Agreements.... [T]he parties specifically intended and agreed that their agreement would be embodied in more than one writing, i.e., in the six Propane Sales Agreements *and* the July 21, 1981 Thomason letter.... [T]he Propane Sales Agreements themselves were not integrated with respect to the two cent discount.... [T]he parol evidence rule has no application because the six contracts and the Thomason letter were contemporaneously prepared documents which, when read together, provide Empire a two cent per gallon discount.... [T]he discount term was governed by the Thomason letter and that the discount provided was a 'two cent per gallon discount from UPG's established price.' That was Empire's theory of the case.... Nor is UPG's discussion of UCC Section 2–305 regarding an 'Open Price Term' applicable under these circumstances. UCC Section 2–305 is a 'gap filler' provision which prevents a contract from being unenforceable even though the price is not settled. Here, although the term 'established price' in paragraph 5 of the Propane Sales Agreements is such an open price term, and thus subject to change, there is no 'gap' with regard to the amount of the discount to be given Empire, which, according to the provisions of the July 21, 1981 Thomason letter, was set at two cents per gallon. Thus, even though UPG's established or posted price would fluctuate with market conditions, the two cent discount from that floating price was intended to remain inflexible.... The parties' agreement was embodied in the July 21, 1981 Thomason letter and the six Propane Sales Agreements.... The evidence at trial amply supported Empire's claim that the Thomason letter was part and parcel of the entire agreement between UPG and Empire.... The foregoing analysis demonstrates that there was abundantly sufficient evidence for the jury to decide the issue of whether the parties intended the two cent discount to be part of the entire deal and to be governed by the July 21, 1981 Thomason letter.... Instruction No. 6, in turn, refers to the fact that UPG agreed to sell propane to Empire at UPG's 'posted price less a two cent per gallon discount' but 'failed to perform [its] agreement.' The use of the word 'conduct' in Instruction No. 8 is the specific modification required by Note 3 of MAI 4.01 to substitute for the word 'occurrence' when that word is inappropriate under the facts. The jury thus knew that the 'conduct' of UPG's upon which damages could be assessed was UPG's reduction of the agreed upon two cent per gallon discount. Consequently, there was no prejudicial error in Instruction No. 8.... Empire's theory of the case, succinctly set forth in its verdict director [Instruction 6], was that the agreement was for a two cent discount and that UPG breached the agreement.... [T]he one deal between the parties was memorialized in the six substantively identical contracts and the Thomason letter."

be assessed, was UPG's reduction of the discount from 2 cents to ½ cent.

It is peculiar (or is it?) that the *argument* portion of Empire's brief makes no attempt to analyze paragraph 5 of the propane sales agreement or the Thomason letter *separately*. This may be due to the fact that such an analysis, in light of U.C.C. § 2–202, causes Empire's position to collapse like a house of cards.

■ Empire takes the position that the propane sales agreement and the Thomason letter were contemporaneous. This court rejects the argument. The latter part of July is not contemporaneous with mid-September.

Each of the six contracts is 11 pages long and signed by the president of UPG and Earl Noe, vice president of Empire, and attested by the secretaries of the two corporations. See *Binks Mfg. Co.*, supra. This court holds that the propane sales agreement, and particularly paragraph 5 with respect to price, was intended by the parties as a final expression of their agreement, and this is so even though the propane sales agreement does not contain a so-called "merger clause."

■ Three versions of paragraph 5 of the propane sales agreement will now be considered. For simplicity, since there is no issue on the item of transportation costs mentioned in (b) of paragraph 5, and no issue on the fact that the revision of the discount from 2 cents to ½ cent was communicated to Empire, those two portions of paragraph 5 will be omitted.

Version A is the *actual* language of paragraph 5. It reads:

"VERSION A

5. PRICE

The price per gallon, F.O.B., *Mont Belvieu, Texas* (or such other point or points as seller may elect) for propane sold hereunder shall be (a) Seller's established price in effect at the time of delivery for the customer category of which Buyer is a member (which price may be revised from time to time during the period this

Agreement is in full force and effect), plus ..."

Version B *omits* the language "in effect at the time of delivery for the customer category of which Buyer is a member." It reads:

"VERSION B

5. PRICE

The price per gallon, F.O.B., *Mont Belvieu, Texas* (or such other point or points as Seller may elect) for propane sold hereunder shall be (a) Seller's established price (which price may be revised from time to time during the period this Agreement is in full force 'and effect), plus ..."

Version C omits the language "(which price may be revised from time to time during the period this Agreement is in full force and effect) ..." It reads:

"VERSION C

5. PRICE

The price per gallon, F.O.B., *Mont Belvieu, Texas* (or such other point or points as Seller may elect) for propane sold hereunder shall be (a) Seller's established price in effect at the time of delivery for the customer category of which Buyer is a member, plus ..."

If the existence of the Thomason letter is ignored for a moment, what does paragraph 5 say about price? Before that inquiry is answered, what does the brief of Empire claim with regard to the construction of paragraph 5?

In the *statement of facts* portion of its brief Empire says: "The propane sales agreements themselves are silent regarding the discount, although they note that the established price (i.e. the 'posted' price) is subject to change." The brief then sets forth paragraph 5. The quoted statement is a mere (and erroneous) conclusion but it does show that Empire construes the language "(which price may be revised from time to time during the period this Agreement is in full force and effect)" to refer to the prices listed in Column A above. Empire's construction is equivalent to advocat-

ing Version B which ignores the language "in effect at the time of delivery for the customer category of which Buyer is a member." Such a construction is improper.

The language appearing in Version A and omitted in Version B was intended by the parties to have significance. Otherwise it would have been left out. The inclusion of it means that the price referred to by the clause in parenthesis appearing in Version A and omitted in Version C is the price in Column B above. It is that price which UPG did revise and which, under the express language of paragraph 5, UPG had the right to revise.

Empire's argument that the propane sales agreement is "silent regarding the discount," coupled with Empire's argument that the Thomason letter is an agreement that the 2-cent discount is constant, is equivalent to advocating Version C which ignores the language "(which price may be revised from time to time during the period this Agreement is in full force and effect.)" *If* the Thomason letter *has* the meaning ascribed to it by Empire, it contradicts the language which Version A contains and Version C omits and is inadmissible. *If* the Thomason letter *does not* have the meaning ascribed to it by Empire, it is immaterial. That is Empire's dilemma.

The language appearing in Version A and omitted in Version C was intended to have some significance. Otherwise it would have been left out. The inclusion of it means that UPG had the right, which it exercised, to revise the price in Column B above.

To summarize, paragraph 5 of the propane sales agreement says that Empire's price is 2 cents below the market price and UPG may revise Empire's price. Empire's position is that the propane sales agreement and the Thomason letter jointly provide that Empire's price is 2 cents below the market price and UPG may not revise Empire's price. If the Thomason letter says that the 2-cent discount may not be revised by UPG, § 2–202 U.C.C. eliminates the letter.

Empire's position is untenable. Since that position was the sole basis for Instruction 6, the jury's verdict pursuant to Instruction 6 and the portion of the judgment based on that verdict cannot stand. That portion of the judgment which is in favor of Empire and against UPG on Empire's petition, and which awards Empire the sum of $4,250,000 thereon, is reversed.

### APPEAL OF EMPIRE—No. 16096

On its appeal Empire presents two points, both dealing with that portion of the trial court's judgment which awarded UPG $2,360,641.79 as prejudgment interest. Before those points are considered, certain things which are not in dispute by either side must be pointed out.

"The questions for decision on appeal are those stated in the points relied on, and a question not there presented will be considered abandoned on appeal and no longer an issue in the case." *Pruellage v. De Seaton Corporation,* 380 S.W.2d 403, 405[3] (Mo.1964). To similar effect see *Conway v. Judd,* 723 S.W.2d 905, 906 (Mo. App.1987); *Smith v. Welch,* 611 S.W.2d 398, 399[1] (Mo.App.1981). Further, "A point is not properly presented for review if it is advanced for the first time in the argument portion of the brief." *Hastings v. Coppage,* 411 S.W.2d 232, 235[4] (Mo. 1967). See also *Berger v. Huser,* 498 S.W.2d 536, 539[2] (Mo.1973).

Empire presents no point challenging that portion of the judgment which awards UPG the sum of $4,104,082.52, nor does Empire challenge the propriety of the trial court's action in directing the jury to return a verdict in that amount in favor of UPG. No point of Empire (and no point of UPG on its appeal) challenges the mathematics which the trial court employed in awarding UPG $2,360,641.79 as prejudgment interest. UPG in its separate appeal makes no claim that either of the two awards in favor of UPG—$4,104,082.52 and $2,360,641.79—was inadequate. The matters set forth in this paragraph are not in issue.

Empire's first point is that the trial court erred in granting prejudgment

interest to UPG "because UPG's claim was not liquidated under Nebraska law." Empire advances two grounds in support of its first point. Ground (a) is: "UPG's claim was subject to reasonable controversy as to both liability and amount, thereby rendering UPG's claim unliquidated and not entitled to prejudgment interest under Nebraska law." Ground (b) is: "Because Empire obtained a set-off, UPG's claim was unliquidated and therefore not entitled to prejudgment interest under Nebraska law."

Empire's "set-off," as mentioned in ground (b), refers to the $4,250,000 award which the jury returned in favor of Empire. That award, together with that portion of the judgment based on it, has been reversed by this court in adjudicating UPG's appeal.

UPG's claim, which this opinion refers to as the counterclaim, was based on 13 unpaid invoices representing propane delivered to Empire under the propane sales agreement.

Empire's brief says:

"Empire acknowledged at trial that it had refused to pay the last thirteen invoices tendered by UPG, but maintained its refusal was justified for two reasons. First, Empire claimed that the UPG invoices were overstated because they failed to give Empire its full two cent per gallon discount. Secondly, Empire claimed it did not owe the invoices because UPG had already collected overcharges of nearly $2,200,000.00 from Empire by the time that the disputed invoices were tendered to Empire in November 1983. (Empire's Category 1 damages.)"

As this court held in the portion of the opinion dealing with UPG's appeal, Empire's position with respect to the 2–cent discount was invalid. That holding is fatal to each of the "two reasons" advanced by Empire in the statement just quoted.

Empire cites several Nebraska cases in support of its position that UPG was not entitled to prejudgment interest.[4] Each of the cited cases [5] is distinguishable because each involved an unliquidated claim of the party who sought prejudgment interest. As the United States Court of Appeals, 8th Circuit, said recently:

"Nebraska law requires prejudgment interest when the amount of the claim is liquidated. . . .

The Nebraska Supreme Court has adopted the following definition of 'liquidated':

'A claim is liquidated if the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance upon opinion or discretion. Examples are claims upon promises to pay a fixed sum, claims for money had and received, claims for money paid out, and claims for goods or services to be paid for at an agreed rate.' . . ."

*Nebraska Public Power Dist. v. Borg–Warner Corp.*, 621 F.2d 282 (8th Cir.1980) (citing Nebraska authorities).

The fundamental flaw in Empire's position is that it has now met defeat on its petition. The cause of action purportedly stated in the petition is invalid. The result is that Empire's petition cannot serve as a setoff (or as a counterclaim if the parties here were reversed).

"Generally, only such demands may be set off as constitute valid and enforceable obligations; an obligation not enforceable in an action at law cannot be

---

**4.** Empire's brief states: "The parties agreed below that Nebraska law applied because the six propane sales agreements so provide in paragraph 11." Empire assumes that the law of Nebraska, rather than the law of the forum, controls the issue of prejudgment interest. It is unnecessary to rule on the validity of that assumption. Cf. 78 A.L.R. 1047 (Interest—Conflict of Laws—Law of Forum). Even if Missouri law applies, UPG is entitled to prejudgment interest. See *Burger v. Wood,* 446 S.W.2d 436, 443–444 (Mo.App.1969).

**5.** *GFH Financial Services Corp. v. Kirk,* 231 Neb. 557, 437 N.W.2d 453 (1989); *Gottsch Feeding Corporation v. Red Cloud Cattle Company,* 229 Neb. 746, 429 N.W.2d 328 (1988); *Gesell v. Reeves,* 229 Neb. 842, 429 N.W.2d 363 (1988); *Suess v. Lee–Sapp Leasing, Inc.,* 229 Neb. 755, 428 N.W.2d 899 (1988); *Langel Chevrolet–Cadillac v. Midwest Bridge,* 213 Neb. 283, 329 N.W.2d 97 (1983); *Philip G. Johnson & Co. v. Salmen,* 211 Neb. 123, 317 N.W.2d 900, 905 (1982).

set off against an opposing claim. One against whom a setoff is claimed must be under the legal obligation to pay the amount of the setoff to the claimant." 20 Am.Jur.2d, Counterclaim, Recoupment, Etc., § 55, p. 273.

The Supreme Court of Nebraska agrees with the proposition that if Empire's claim is an invalid one, as this court has held, it may not be used as a setoff against the claim of UPG. In *Wiebe Const. Co. v. School Dist. of Millard*, 198 Neb. 730, 255 N.W.2d 413, 417, the Nebraska court said:

"We hold that in an action for a liquidated sum which represents a balance owing on a contract, the amount claimed does not become an unliquidated claim merely because of the assertion of an offset, and that if the trier of fact finds against the defendant on the offset, prejudgment interest should be awarded on the plaintiff's claim."

To similar effect see *King v. Air Harbor Air Serv., Inc.*, 204 Neb. 4, 281 N.W.2d 209, 210[2] (1979).

Empire may not properly claim that *Wiebe* is distinguishable because in the case at bar the jury, as a trier of fact, found in favor of Empire. This court has held that Instruction 6, the only claim Empire sought to submit, was improperly submitted for lack of evidentiary support. Empire's claim was in fact invalid and it is of no moment that the jury was misled into thinking it was a valid one.

Other authorities hold that an invalid claim may not serve as a basis for a setoff against a valid claim of the opposing party. *In re Clayton Magazines, Inc.*, 77 F.2d 852, 853 (2d Cir.1935); *Flying Tiger Line, Inc. v. United States*, 145 Ct.Cl. 1, 170 F.Supp. 422, 425[4] (1959); *In re Texoil Service Co.*, 122 F.Supp. 276, 279[2] (E.D. Tex.1954); *Forest County Coop. Ass'n (A.A.L.) v. Manis*, 235 So.2d 925, 926 (Miss. 1970); *W.J. Kroeger Co. v. Travelers Ind. Co.*, 112 Ariz. 285, 541 P.2d 385, 387[7] (1974); 80 C.J.S., Set-off and Counterclaim, § 26, p. 35.

This court rejects ground (a) of Empire's first point. For the reasons set forth in the discussion of UPG's appeal, UPG's claim was not subject to reasonable controversy either as to liability or amount, and thus, contrary to Empire's argument, UPG's claim, based on the 13 unpaid invoices, was liquidated. This court also rejects ground (b) for the reason that the so-called setoff referred to by Empire has been reversed by this court. Empire's first point has no merit.

Empire's second point is that the trial court erred "by failing to comply with Missouri procedural law which mandates a setoff of judgments prior to calculation of prejudgment interest on any remaining balance." This point is now moot for the reason that this court has reversed the award of $4,250,000 in favor of Empire on its petition. As corrected by this court, the trial court's judgment is not subject to the criticism leveled against it by Empire's second point. Empire's appeal has no merit.

### ORDER

That portion of the trial court's judgment entered January 4, 1989, awarding Empire Gas Corporation $4,250,000 on its petition is reversed; that portion of said judgment taxing one-half of the costs against UPG, Inc., is reversed, and all costs are taxed against Empire Gas Corporation; that portion of said judgment awarding UPG, Inc. $4,104,082.52, together with prejudgment interest of $2,360,641.79, for a total award of $6,464,724.31, is affirmed; in all other respects said judgment is affirmed. It is so ordered.

MAUS and GREENE, JJ., concur.